CANNONBALL FUND, LTD., & others[1] *vs.* DUTCHESS CAPITAL MANAGEMENT, LLC, & others.[2]

No. 12-P-876.

Suffolk. January 17, 2013. - August 2, 2013.

Present: CYPHER, RUBIN, & WOLOHOJIAN, JJ.

*Limitations, Statute of. Practice, Civil,* Statute of limitations, Dismissal, Standing. *Jurisdiction,* Personal, Long-arm statute, Nonresident. *Corporation,* Derivative action. *Fiduciary. Partnership,* Fiduciary duty. *Negligence,* Causation. *Due Process of Law,* Jurisdiction over nonresident. *Contract,* Implied covenant of good faith and fair dealing, Performance and breach.

Discussion of the savings statute, G. L. c. 260, § 32, which permits the refiling of a suit after the limitations period, provided the suit had been timely commenced previously and certain additional conditions have been met. [84-86]

This court concluded that the savings statute, G. L. c. 260, § 32, extends to a suit in which the plaintiff voluntarily dismissed the claim. [86-89]

A Superior Court judge erred in dismissing, on statute of limitations grounds, a civil action brought individually and derivatively by investors in two "feeder" hedge funds against those who controlled or were involved in the operation of the feeder and master funds and a related entity, against one feeder fund's accounting firm, and against the administrator of both feeder funds, where the plaintiffs' voluntary dismissal, eight months earlier, of a prior action in Delaware was for a matter of form within the meaning of the savings statute, G. L. c. 260, § 32, with respect to certain defendants who had moved to dismiss for lack of personal jurisdiction; on the other hand, the judge properly dismissed the action with respect to other defendants who had not so moved. [89-93]

Investors in two "feeder" hedge funds had standing under Cayman Islands law to bring a claim for breach of fiduciary duty derivatively on behalf of one of the feeder funds against the fund's investment manager and three related individuals, where, taken as a whole, the complaint set out a hedge

[1]Cannonball Plus Fund, Ltd.; East Orient Ltd.; Mark Wenzel; the trustees of the Geraldine K. Schwab Revocable Trust; and the Carrswold Partnership, individually on behalf of themselves and derivatively on behalf of Dutchess Private Equities Fund, L.P., and Dutchess Private Equities Cayman Fund, Ltd.

[2]Dutchess Advisors, LLC; Michael Novielli; Douglas Leighton; Theodore Smith; Sullivan Bille PC; and Dundee Leeds Management Services; and nominal defendants Dutchess Private Equities Fund, L.P., Dutchess Private Equities Cayman Fund, Ltd., and Dutchess Private Equities Fund, Ltd.

fund master-feeder system controlled, managed, and directed by the three individual defendants using various corporate entities; and where the complaint also alleged that the investment manager benefited at the expense of the feeder fund [93-95]; further, with respect to a claim of professional malpractice against the entity that audited the feeder funds' statements of financial condition, the complaint alleged factual questions regarding both duty and causation that were sufficient to withstand a motion to dismiss [95-97]; finally, the plaintiffs made a prima facie showing of personal jurisdiction over the administrator for the two funds sufficient to withstand a motion to dismiss [97-99].

CIVIL ACTION commenced in the Superior Court Department on June 21, 2011.

Motions to dismiss were heard by *Judith Fabricant*, J.

*John F. Hagan, Jr.*, of Illinois, for the plaintiffs.

*Sanford F. Remz* for Sullivan Bille, P.C.

*Matthew Iverson* for Dutchess Capital Management, LLC, & others.

WOLOHOJIAN, J. This is the second suit brought individually and derivatively by investors in two "feeder" hedge funds against those who controlled or were involved in the operation of the feeder and master funds[3] and a related entity, against one feeder fund's accounting firm, and against the administrator of both feeder funds. The plaintiffs previously filed a substantially similar case in the Delaware Court of Chancery. After four of the defendants moved to dismiss the Delaware claims for lack of personal jurisdiction, the plaintiffs voluntarily dismissed the Delaware suit in its entirety. Almost eight months later, the plaintiffs then filed this case in the Superior Court.

The primary issue on appeal is whether the plaintiffs are entitled to the benefit of the Massachusetts savings statute, G. L. c. 260, § 32, which permits claims that were timely when

---

[3]"[A] 'master-feeder' structure . . . allows for the unified management of multiple pools of assets for investors in different taxable categories. . . . The master fund is usually organized as a corporation, such as an international business company, under non-U.S. law. It offers shares to one or more domestic feeder funds and one or more offshore corporate feeder funds, all of which share common investment strategies and objectives." *In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*, 389 B.R. 325, 328 n.3 (Bankr. S.D.N.Y. 2008), quoting from Securities and Exchange Commission, Staff Report: Implications of the Growth of Hedge Funds 9 & n.26 (2003).

originally filed to be refiled (despite the subsequent running of the limitations period) within one year after being dismissed "for any matter of form." We conclude that voluntary dismissals are not per se excluded from the scope of the savings statute. We also conclude, however, that the record does not establish that all the claims dismissed in the Delaware action were dismissed for a matter of form. Those claims that were not dismissed for a matter of form were properly dismissed by the Superior Court judge as untimely. Those claims for which a sufficient question of fact was raised in the Superior Court, at least at the pleading stage, as to whether they were voluntarily dismissed in the Delaware action because the plaintiffs had an objectively reasonable expectation that the claims would be involuntarily dismissed by the Delaware court for lack of personal jurisdiction (and hence dismissed for a matter of form) should not have been dismissed by the Superior Court judge as untimely. Finally, we reject the defendants' arguments that the complaint (a) contains insufficient allegations to establish the plaintiffs' standing under Cayman Islands law to assert a breach of fiduciary duty claim derivatively on behalf of Dutchess Private Equities Cayman Fund Ltd. (Dutchess Ltd.), (b) does not sufficiently allege duty or causation with respect to the claim of professional negligence against Sullivan Bille PC (Sullivan Bille), and (c) does not meet the plaintiffs' burden of a prima facie showing of personal jurisdiction over Dundee Leeds Management Services (Dundee Leeds).

1. *Allegations of the complaint.* In broad summary, the plaintiffs allege that they were induced to invest (and to remain invested) in two feeder hedge funds based on false representations concerning the investment strategy, criteria, and approach of the funds. In more detail, the Delaware and Superior Court complaints alleged the following.

The plaintiffs invested in two feeder funds: Dutchess Private Equities Fund, L.P. (Dutchess L.P.), a Delaware limited partnership, and Dutchess Ltd., a Cayman Islands exempt corporation. Three of the plaintiffs[4] (the Dutchess Ltd. plaintiffs) purchased

---

[4]Cannonball Fund, Ltd., and Cannonball Plus Fund, Ltd., both open-ended investment funds incorporated in the British Virgin Islands; and East Orient Ltd., a private investment fund incorporated in the Seychelles.

shares in Dutchess Ltd., while the other three plaintiffs[5] (the Dutchess L.P. plaintiffs) became limited partners in Dutchess L.P. The two feeder funds fed investor money to a master fund, Dutchess Private Equities Fund, Ltd., a Cayman Islands exempt corporation, which made all investments on their behalf.

The defendants are companies, professional service providers, and individuals who were involved with, and connected to, the feeder funds. Dutchess Capital Management, LLC (DCM), a Connecticut limited liability company, is the investment manager for both feeder funds, and is also the sole general partner of Dutchess L.P.[6] Dutchess Advisors, LLC (Dutchess Advisors), also a Connecticut limited liability company, provides consulting services for the companies in which the master fund invested on behalf of the feeder funds. The two feeder funds, the master fund, DCM, and Dutchess Advisors all operated out of the same shared office in Boston.

The Dutchess family of entities share the three individual defendants as common key personnel. Defendant Douglas Leighton, a Massachusetts citizen, and defendant Michael Novielli, a New York citizen, are cofounders, principals, and comanaging members of both DCM and Dutchess Advisors. They are also the sole directors of both Dutchess Ltd. and the master fund. In addition, they have full authority to conduct the affairs of Dutchess L.P. Defendant Theodore Smith, a Massachusetts citizen, holds various high-level offices within DCM, is the director of corporate finance for Dutchess L.P., and is the vice-president of business development for Dutchess Advisors.

Defendant Sullivan Bille is a Massachusetts professional corporation operating out of an office in Tewksbury. Sullivan Bille audited Dutchess L.P.'s statements of financial condition as of December 31, 2005, and December 31, 2006, and provided unqualified audit opinions for those periods dated March 3, 2006,

---

[5]Mark Wenzel, a resident of Ohio; the trustees of the Geraldine K. Schwab Revocable Trust, a Missouri trust; and the Carrswold Partnership, a Missouri partnership. Wenzel initially was a limited partner of Dutchess Private Equities Fund II, L.P., (Dutchess L.P. II), a limited partnership which consolidated into Dutchess L.P. in January of 2007. However, Wenzel also invested directly in Dutchess L.P., as did the other two Dutchess L.P. plaintiffs.

[6]DCM was also the sole general partner of Dutchess L.P. II until that entity was subsumed by Dutchess L.P. See note 5, *supra*.

and April 17, 2007, respectively. Defendant Dundee Leeds is a Cayman Islands corporation operating out of an office in George Town, Grand Cayman. Dundee Leeds is the fund administrator for the two feeder funds, and is responsible for calculating the funds' net asset value (NAV) and providing that information to the funds.

Unable to improve upon the Superior Court judge's excellent summary of the substantive allegations of the complaint, we accordingly set it out here:

> "According to the complaint, the Dutchess defendants represented both orally and in writing that prospective investors' investments in the funds would be protected in three ways. First, companies targeted for investment would have a positive cash flow with which they could repay the funds. Second, the funds would invest only in freely tradeable and liquid companies that would permit the funds to convert debt securities into newly-issued stock at less than market price. Third, the funds would lend money only to companies with sufficient assets to secure a substantial portion of the funds' investments. The Dutchess defendants assured investors that their due diligence would involve evaluating the business forecast, performance and stability of the target companies. They also asserted that they would refrain from any conduct that would create a conflict of interest between [DCM] and Dutchess Advisors (and their individual members and directors) on the one hand and the funds and their investors on the other hand.[7]

> "The gist of the plaintiffs' complaint is that the Dutchess defendants misrepresented their stated investment objectives and breached their fiduciary duties by making a series of questionable investments in two companies, Challenger Powerboats, Inc. [Challenger] and Siena Technologies

---

[7] "According to the complaint, the Dutchess defendants made these written representations in a 2000 Dutchess L.P. Offering Memo and a 2007 Dutchess Ltd. Placement Memo, which were similar in all material respects. The plaintiffs assert that they relied on these, as well as on a 2003 PowerPoint presentation distributed to potential investors, due diligence questionnaires dated 2004 and 2006, a November 2006 'Hedge Connection' marketing [electronic mail message], and multiple unqualified audits of Dutchess L.P. They also point to oral representations in a series of meetings with Leighton in 2006 and 2007, and in conversations between Leighton and Wenzel on February 28, 2008."

[Siena], starting in 2003. The complaint alleges that the Dutchess defendants departed from their standards and procedures concerning conflicts of interest when, beginning in 2003, they caused Dutchess L.P. and Dutchess Ltd. to invest approximately $30 million in Challenger and Siena for the purpose of enriching themselves personally through fees, stock grants and other compensation. They did so despite auditors' going concern qualifications for both companies year after year.[8] After the Dutchess defendants' efforts to salvage those companies failed, [DCM] by letter dated February 27, 2008, informed the plaintiffs that it would freeze their redemption rights in Dutchess L.P. and Dutchess Ltd. effective February 29, 2008. On April 16, 2008, the Dutchess defendants announced a $31 million write-down of three portfolios.[9,10]"

---

[8] "With respect to Challenger, the plaintiffs contend that, as a condition of the investment, the Dutchess defendants required Challenger to hire first Novielli and Leighton, and subsequently Smith, as consultants, in exchange for substantial shares of Challenger stock. Novielli, Leighton and Smith joined Challenger's board of directors in June, 2006, eventually becoming the board's only members. According to the complaint, each year the auditors issued a 'going concern' qualification, expressing the view that the company might not be able to survive the year. Regardless of Challenger's financial difficulties, and what the plaintiffs argue was a series of bad acquisitions on Challenger's part, the Dutchess defendants continued to prop Challenger up with multiple cash infusions and loans totaling nearly $20 million of the funds' assets, $9 million of which was contributed between January 2007 and January 2008. The plaintiffs assert that Novielli, Leighton and Smith received substantial stock and cash from their involvement with Challenger, while the funds recovered only about $900,000. The facts alleged with respect to Siena are very much the same. According to the plaintiffs, Novielli and Leighton served on Siena's board of directors, and the funds entered into a series of loans for transactions that proved disastrous. Although Siena posted net losses of $4.2 million in 2004 and $15.5 million in 2005, the Dutchess defendants entered into two loan restructuring agreements whereby Dutchess L.P. forgave $7.6 million of debt in return for an unsecured promissory note in a lesser amount, allowed Siena to borrow without the funds' consent, and waived certain of the funds' claims regarding Siena's loans. The complaint alleges that Novielli and Leighton reaped large consulting fees and other compensation."

[9] "The master fund wrote down $19,600,000 of its remaining investment in Challenger, $7,500,000 of its investment in Execute Sports, and approximately $4,000,000 of its investment in DNA Print Genomics. The plaintiffs make no claims with respect to any investments in Execute Sports and DNA Print Genomics."

[10] "The Dutchess defendants last invested in Siena in July 2007. Challenger filed for bankruptcy on April 25, 2008."

The plaintiffs bring both derivative and direct claims.[11] All plaintiffs make direct claims of fraud and negligent misrepresentation against DCM, Novielli, Leighton, and Smith (counts V-VII[2]). Derivatively, on behalf of both feeder funds, the plaintiffs claim that DCM, Novielli, Leighton, and Smith breached their fiduciary duties by not following the stated investment strategy and by enriching themselves at the expense of the plaintiffs (count I). Also in that capacity, they claim that the same defendants together with Dutchess Advisors were unjustly enriched (count IX). Finally, they bring a derivative professional malpractice claim against Dundee Leeds (count XI). The subgroup of Dutchess L.P. plaintiffs derivatively claim that DCM breached the covenant of good faith and fair dealing implied in the partnership agreement (count III), and that Sullivan Bille committed professional malpractice (count X). Directly, the Dutchess L.P. plaintiffs bring a claim against DCM for breach of contract (the partnership agreement) (count II).

*2. Procedural background.* a. *The Delaware suit.* On April 13, 2010, the plaintiffs filed suit in the Delaware Court of Chancery. The parties accept that all claims were timely asserted in the Delaware suit. Dutchess Advisors, Sullivan Bille, Dundee Leeds, and Dutchess Ltd.[12] moved to dismiss for lack of personal jurisdiction. The remaining defendants raised no jurisdictional defense to the Delaware action.

We can infer[13] that, in response to the defendants' jurisdictional challenge, the plaintiffs filed a motion for jurisdictional discovery. We do so from the fact that the Delaware court denied such a motion "except to the limited extent stated on the record with respect to Sullivan [Bille]. Plaintiffs shall have two weeks in which to file an answering brief in opposition to the underlying motions to dismiss or to amend their complaint." That order

---

[11]The appendix to this opinion sets forth a chart outlining the claims asserted in the complaint, together with the identities of the parties asserting them and against whom they are asserted.

[12]Dutchess Ltd. was named as a defendant in just one claim in the Delaware action, the claim for an accounting. That claim is not made in the Massachusetts action, and Dutchess Ltd. is not named as a defendant in any claim in the Massachusetts suit.

[13]The record before us does not contain the docket of the Delaware action, nor any of the filings associated with the motion for jurisdictional discovery.

was entered on October 21, 2010, after a hearing the same day.[14]

Shortly thereafter, on November 4, 2010, the plaintiffs filed a proposed order of voluntary dismissal of all claims, pursuant to Delaware Court of Chancery Rule 41(a)(1),[15] and subject to court approval.[16] No reason was given for the dismissal, but the proposed order stated that "[p]ursuant to Court of Chancery Rule 23.1(c),[17] the undersigned [plaintiffs' counsel] hereby represents that no compensation in any form has passed directly or indirectly from any Defendant to Plaintiffs or Plaintiffs' attorneys and that no promise to give any such compensation has been made." Apparently without any further procedure or pro-

---

[14]Although the transcript of this Delaware court hearing is in the record appendix, for reasons that are explained below in our discussion, the contents of the transcript were not properly before the Superior Court motion judge. We therefore do not summarize them.

[15]"Subject to payment of costs and the provisions of Rule 23(e) and Rule 23.1 an action may be dismissed by the plaintiff without order of court (i) by filing a notice of dismissal at any time before service by the adverse party of an answer or of a motion for summary judgment, whichever first occurs or (ii) by filing a stipulation or dismissal signed by all the parties who have appeared in the action. However, no such dismissal pursuant to subpart (i) above shall be effective where the complaint is subject to a motion to dismiss and the plaintiff has chosen to file an answering brief rather than seeking to amend. See Rule 15(aaa). Unless otherwise stated in the notice of dismissal or stipulation, the dismissal is without prejudice, except that a notice of dismissal operates as an adjudication upon the merits when filed by a plaintiff who has once dismissed in any court of the United States or of any state an action based on or including the same claim."

[16]Court approval was necessary because many of the claims were asserted derivatively. Delaware Court of Chancery Rule 23.1(c). See note 17, *infra.*

[17]That rule states as follows:

"The action shall not be dismissed or compromised without the approval of the Court, and notice by mail, publication or otherwise of the proposed dismissal or compromise shall be given to shareholders or members in such manner as the Court directs; except that if the dismissal is to be without prejudice or with prejudice to the plaintiff only, then such dismissal shall be ordered without notice thereof if there is a showing that no compensation in any form has passed directly or indirectly from any of the defendants to the plaintiff or plaintiff's attorney and that no promise to give any such compensation has been made. At the time that any party moves or otherwise applies to the Court for approval of a compromise of all or any part of a derivative action, each representative plaintiff in such action shall file with the Register in Chancery a further affidavit in the form required by subpart (b) of this rule."

ceeding, the proposed order was approved by the court and entered the day after it was filed.

b. *The Massachusetts suit.* The plaintiffs then filed the complaint underlying this appeal in Superior Court on June 21, 2011. The parties accept for purposes of this appeal that the claims asserted in the Superior Court complaint accrued no later than April, 2008 — more than three years before the filing of the complaint. It is also not disputed that the claims raised in the Massachusetts action are substantially similar to ones raised in the Delaware suit.[18]

All defendants except for Dundee Leeds moved under Mass. R.Civ.P. 12(b)(6), 365 Mass. 754 (1974), to dismiss on the ground that the claims were barred by the applicable statutes of limitations.[19],[20] The plaintiffs conceded that most of the claims are subject to three-year limitations periods under either Delaware or Massachusetts law,[21],[22] but argued that the claims were nonetheless timely by virtue of the Massachusetts savings statute, G. L. c. 260, § 32, as appearing in St. 1973, c. 1114, § 340, which reads in relevant part,

"If an action duly commenced within the time limited in

---

[18]The Delaware complaint named an additional accounting firm defendant, Marcum & Kliegman LLP (Marcum), a New York limited liability partnership. The plaintiffs sued Marcum in New York after the Delaware suit was dismissed.

[19]The defendants also moved to dismiss on other grounds, which we address elsewhere when necessary.

[20]Dundee Leeds joins in the limitations argument on appeal. But even were we to assume that Dundee Leeds's cursory argument regarding the savings statute satisfies the requirements of Mass.R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975), the argument was waived by not having been raised below. *Carey* v. *New England Organ Bank,* 446 Mass. 270, 285 (2006).

[21]Specifically, the plaintiffs acknowledged that (1) count I (as brought on behalf of Dutchess L.P.), count II, and count III are subject to Delaware's three-year statute of limitations, Del. Code Ann. tit. 10, § 8106 (1999 & Supp. 2012); and (2) count V, count VI, count VII[1], count VII[2], count IX, and count X are subject to Massachusetts's three-year statute of limitations for tort claims, G. L. c. 260, § 2A.

[22]The only claims the plaintiffs did not concede were subject to a three-year limitations period are count I (breach of fiduciary duty) as asserted derivatively on behalf of Dutchess Ltd. and count XI (professional malpractice) against Dundee Leeds. And, at least for purposes of the motion to dismiss, the defendants appear to have acknowledged that those two claims are subject to a six-year limitations period under Cayman Islands law. See Cayman Is. Limitation Law (1996 Revision), § 4(1).

this chapter . . . is dismissed . . . for any matter of form, . . . the plaintiff or any person claiming under him may commence a new action for the same cause within one year after the dismissal or other determination of the original action . . . ."

The plaintiffs argued that the savings statute applies because (1) the claims were timely when first asserted in Delaware; (2) the Delaware claims were dismissed for a matter of form, namely, lack of personal jurisdiction over some of the defendants; and (3) the same claims were filed in Superior Court within one year of the dismissal of the Delaware action.

The motions to dismiss were heard and allowed by a Superior Court judge sitting in the business litigation session. She ruled as a matter of law that voluntary dismissals do not fall within the scope of the savings statute and that, therefore, all of the claims subject to three-year limitations periods were untimely filed in Massachusetts. She also concluded that the plaintiffs had failed to allege facts sufficient to establish standing to assert their breach of fiduciary duty claim derivatively on behalf of Dutchess Ltd. under Cayman Islands law (count I). Finally, she ruled that there is no personal jurisdiction in Massachusetts over Dundee Leeds and that, therefore, the professional malpractice claim against Dundee Leeds (count XI) should be dismissed. Judgment entered against the plaintiffs, and this appeal followed.

3. *Discussion.* a. *Savings statute.* Massachusetts has had a savings statute since the early 1770s, and its text has remained largely unmodified since then. See Province Laws 1770-1771, c. 9, § 3; St. 1793, c. 75, § 2; R.S. 1836, c. 119, § 15; R.S. 1836, c. 120, § 11; G.S. 1860, c. 154, § 15; G.S. 1860, c. 155, § 11; P.S. 1882, c. 196, § 12; P.S. 1882, c. 197, § 13; R.L. 1902, c. 202, § 31; G. L. c. 260, § 32. From the beginning, the statute has allowed the refiling of a suit after the limitations period, provided the suit had been timely commenced previously and certain additional conditions have been met. "The plain purpose of the statute is to relieve a person who, in the exercise of due diligence, within the time limited by the general statute of limitations, has attempted to enforce a claim by suit, and has failed in such attempt by reason of some matter of form, which can be remedied in a new proceeding, and which

does not affect the merits of his case." *Cumming* v. *Jacobs*, 130 Mass. 419, 421 (1881). "The statute is remedial, and its words are not to be construed unfavorably to the plaintiff." *Ibid.* "The provisions of G. L. c. 260, § 32, are to be construed liberally, in the interest of determining the parties' rights on the merits." *Boutiette* v. *Dickinson*, 54 Mass. App. Ct. 817, 818 (2002). The words of the statute "never have been held to have a technical meaning." *Loomer* v. *Dionne*, 338 Mass. 348, 351 (1959), quoting from *Woods* v. *Houghton*, 1 Gray 580, 583 (1854).

The 1793 version of the statute permitted the filing of a second suit where the first suit was "abated, or the action thereby commenced [was] avoided by demurrer, or otherwise, *for informality of proceedings*" (emphasis added). St. 1793, c. 75, § 2. Under R.S. 1836, c. 120, § 11, refiling was available where the first action was "abated, or . . . otherwise avoided or defeated, . . . *for any matter of form*" (emphasis added). This appears to be the earliest introduction into the statute of the phrase "for any matter of form." However, the change in phraseology was not a change in the law, *Allen* v. *Sawtelle*, 7 Gray 165, 166 (1856), and the language was construed to mean that the first suit had been terminated for any reason that "did not concern the substance of the question in controversy between the parties, nor in any degree affect the merits of the suit." *Id.* at 165. To like effect, the Supreme Judicial Court explained that the savings clause of a related statute of limitations (St. 1786, c. 52, § 1) "declares that where the plaintiff has been defeated by some matter not affecting the merits, some defect or informality, which he can remedy or avoid by a new process, the statute shall not prevent him from doing so, provided he follows it promptly, by a suit within a year." *Coffin* v. *Cottle*, 16 Pick. 383, 386 (1835).

The phrase "for any matter of form" has remained in every version of the savings statute since 1836. See G.S. 1860, c. 155, § 11; P.S. 1882, c. 197, § 13; R.L. 1902, c. 202, § 31; G. L. c. 260, § 32. As noted earlier, the current statute provides that if a timely action "is dismissed . . . for any matter of form, . . . the plaintiff . . . may commence a new action for the same cause within one year after the dismissal or other deter-

mination of the original action."[23] G. L. c. 260, § 32. This appeal turns on two questions: whether voluntary dismissals are per se excluded from the protection of the savings statute, and, if not, whether the voluntary dismissal in this case was for a matter of form. We take each question in turn.

i. *Are voluntary dismissals excluded from the savings statute?* The defendants argue that the statute extends only to suits that have been involuntarily dismissed by a court. The statute itself is silent, drawing no explicit distinction between voluntary and involuntary dismissals. G. L. c. 260, § 32. In this way, our statute stands in contrast to the savings statutes of other States, some of which explicitly exclude voluntary dismissals and others of which explicitly include them.[24] The defendants' argument therefore focuses on the phrases "is dismissed" and "dismissal or other determination," both of which they contend imply court action, rather than voluntary dismissal. Our courts have not previously construed the statute this narrowly.[25] See, e.g., *Swan* v.

---

[23]The defendants argue in cursory fashion that the claims subject to the Delaware statute of limitations (namely, count I [as brought by Dutchess L.P.], count II, and count III) are subject only to the Delaware savings statute, Del. Code Ann. tit. 10, § 8118 (1999). If so, those claims would be untimely because Delaware's savings statute does not apply to voluntary dismissals. See *Graleski* v. *ILC Dover*, 26 A.3d 213 (Del. 2011) (table). We need not reach the defendants' argument because the Massachusetts savings statute would not apply to those claims in any event.

[24]For example, North Carolina and Georgia both expressly include voluntary dismissals in the protection of their savings statutes, Ga. Code Ann. § 9-2-61 (2007) (saving applies where "plaintiff discontinues or dismisses" case); N.C. Gen. Stat. § 1A-1, Rule 41(a)(1) (2011), whereas Pennsylvania and Montana explicitly exclude them, Mont. Code Ann. § 27-2-407 (2011) (excluding "voluntary discontinuance"); 42 Pa. Cons. Stat. Ann. § 5535(a)(2)(ii) (West 2004) (excluding "voluntary nonsuit").

A helpful review of how voluntary dismissals are treated in many States can be found in Marvel, Voluntary Dismissal or Nonsuit as Within Provision of Statute Extending Time for New Action in Case of Dismissal or Failure of Original Action Otherwise Than Upon the Merits, 79 A.L.R.2d 1290 (1961 & Later Case Service 2010). However, as noted in *Duff* v. *Zonis*, 327 Mass. 347, 352 (1951), "[c]ases in other jurisdictions are in conflict, many of them depending upon statutes and theories . . . which are less liberal than those prevailing in this Commonwealth."

[25]Court action alone does not seem dispositive to us in any event. Otherwise, the fact that court approval was required to dismiss the Delaware action would alone suffice to defeat the defendants' argument.

*Littlefield*, 6 Cush. 417 (1850) (savings statute does not apply if voluntary nonsuit was on merits).

For example, in *Loomer* v. *Dionne*, 338 Mass. 348 (1959), the plaintiffs' attorney sent to the deputy sheriffs a timely writ in Superior Court with directions to serve the defendant and make a real estate attachment. The writ described the action as in tort for personal injuries and consequential damages as a result of a motor vehicle accident. When plaintiffs' counsel attempted to enter the writ, he was told, correctly, that "the Superior Court no longer had jurisdiction of automobile tort actions"; by statute, the District Court had exclusive original jurisdiction. *Id.* at 349. The plaintiffs' counsel for this reason then informed the defendant's counsel that he would commence suit instead in the District Court. By the time the District Court action was commenced, the statute of limitations had run. The Supreme Judicial Court held that the plaintiffs were entitled to the benefit of the savings statute even though the first action was voluntarily not pursued. The court explained,

> "the error in bringing the action in the Superior Court, which lacked jurisdiction . . . , did not prevent the action from being 'duly commenced,' or from being 'avoided or defeated . . . for any matter of form.' The first action notified the defendant that resort was to be made to the courts. There was no default or other neglect in the prosecution of a case legally pending in court as in *Cumming* v. *Jacobs*, 130 Mass. 419 [1881]. This is not a situation where the first action was intentionally brought in the wrong court."

*Id.* at 351-352.

Similarly, in *Duff* v. *Zonis*, 327 Mass. 347, 349-350 (1951), the plaintiff's attorney, knowing that the statute of limitations would expire two days later (the first day being a holiday and the second a Saturday), prepared a timely writ in tort against the "Zonis Manufacturing Company" without checking to make sure he had correctly named the defendant owner of the commercial truck involved in the accident with the plaintiff. The named company, which was listed as the owner on the truck's registration form, was in reality not a corporation but the busi-

ness name of a partnership. The deputy sheriff was unable to serve the writ, which was returned to the attorney and was never entered. The plaintiff subsequently brought suit against the properly named defendant partners after the statute of limitations had expired. The court held that the savings statute applied because the first action had been "duly commenced" within the limitations period, emphasizing a liberal construction of the statute. *Id.* at 350-352.

In sum, we see nothing in our case law to indicate that the savings statute applies only where the first action is involuntarily dismissed by a court. Instead, our cases indicate that we are to look to the specific facts and circumstances surrounding the termination of the first suit to determine whether "*the plaintiff has been defeated by some matter not affecting the merits, some defect or informality, which he can remedy or avoid by a new process*" (emphasis added). *Woods* v. *Houghton,* 1 Gray at 583, quoting from *Coffin* v. *Cottle,* 16 Pick. at 386. The inquiry does not turn solely on whether the first suit was voluntarily or involuntarily dismissed, although that is certainly a factor to be considered.[26],[27]

Our conclusion in this regard has the ancillary benefit of not creating a disincentive to plaintiffs who are frank and practical enough to acknowledge some defect of form in their suit and to voluntarily dismiss their claim as a result without further waste of scarce judicial resources. We see no reason to require further litigation simply to have the court dismiss involuntarily a claim the plaintiff is prepared to dismiss himself for the same defect of form.[28] See *Liberace* v. *Conway,* 31 Mass. App. Ct. 40, 43 (1991) ("It would surely be anomalous to adopt a construction

[26]We emphasize that nothing in our opinion should be taken to endorse the strategic initiation or dismissal of litigation for the purpose of taking advantage of the extension provided by the savings statute. There must be "no indication in the record that the plaintiff attempted for dilatory purposes to prolong the limitations period by reliance on the statute." *Boutiette* v. *Dickinson,* 54 Mass. App. Ct. at 819.

[27]"[A] touchstone for what constitutes dismissal for reasons of matter of form is whether, within the original statute of limitations period, the defendant had actual notice that a court action had been initiated" (footnote omitted). *Liberace* v. *Conway,* 31 Mass. App. Ct. 40, 44 (1991). There is no dispute that the defendants had notice of the Delaware action.

[28]That said, plaintiffs wishing to avoid future litigation over whether their

of § 32 which deprived pendent claims of the statute's benefit and thereby pressed on the Federal courts retention of jurisdiction over those claims").

We turn next to the question whether the claims in this case were voluntarily dismissed for a matter of form.

ii. *Was the dismissal in this case for a matter of form?* Involuntary dismissal for lack of jurisdiction is dismissal "for a matter of form" within the meaning of the savings statute. See *Ciampa* v. *Beverly Airport Commn.*, 38 Mass. App. Ct. 974, 974 (1995) (subject matter jurisdiction); *Boutiette* v. *Dickinson*, 54 Mass. App. Ct. at 817, 818 (personal jurisdiction and subject matter jurisdiction); *Rodi* v. *Southern New England Sch. of Law*, 389 F.3d 5, 18 (1st Cir. 2004) ("A dismissal for lack of personal jurisdiction is the paradigmatic example of a decision not on the merits that can be cured by new process in a different court"). In our view, a voluntary dismissal of claims made because of an objectively reasonable expectation that they would otherwise be involuntarily dismissed for lack of personal jurisdiction is also a dismissal for a matter of form within the meaning of the savings statute. The plaintiffs' reasons for dismissing the Delaware suit are a question of fact. See *Lawrence Sav. Bank* v. *Levenson*, 59 Mass. App. Ct. 699, 709 (2003) (where plaintiff has claimed trial by jury, disputed issues relative to statute of limitations are to be decided by jury); *Khatchatourian* v. *Encompass Ins. Co. of Mass.*, 78 Mass. App. Ct. 53, 57 (2010) (plaintiffs' knowledge for purposes of statute of limitations is question of fact). Whether those reasons were a "matter of form" within the meaning of G. L. c. 260, § 32, is a mixed question of law and fact. We review de novo the question whether the factual allegations properly before the judge on the motions to dismiss made plausible a resolution of that mixed question in the plaintiffs' favor. See *Iannacchino* v. *Ford Motor Co.*, 451 Mass. 623, 636 (2008).

As an initial matter, the defendants contend that they were entitled to judgment because the complaint was silent as to the

voluntarily dismissed claims are entitled to the savings statute should either obtain an agreement with their opposing party to that effect, specify the reason for dismissal in their motion or notice of dismissal, or obtain an order from the court specifying the reason for dismissal.

existence of the Delaware suit, let alone the reasons for its
dismissal. Therefore, they continue, the allegations of the com-
plaint did not justify application of the savings statute. The
defendants' argument fails because allegations relied on to toll
the statute of limitations, or "saving facts," need not be pleaded
in a complaint. *Friedman* v. *Jablonski*, 371 Mass. 482, 487
(1976). See *Passatempo* v. *McMenimen*, 461 Mass. 279, 294
n.17 (2012). Instead, "[i]f the defendant[s] pleaded the statute
of limitations, the plaintiffs could allege the saving circumstance
in reply to that defense." *Friedman, supra.*

Here, the defendants raised the statutes of limitations in their
motions to dismiss. At that point, "once [a] defendant establishes
that the time period between the plaintiff's injury and the
plaintiff's complaint exceeds the limitations period set forth in
the applicable statute, the plaintiff bears the burden of alleging
facts which would take his or her claim outside the statute."
*O'Connor* v. *Redstone*, 452 Mass. 537, 551 (2008), quoting
from *McGuinness* v. *Cotter*, 412 Mass. 617, 620 (1992). It was
incumbent upon the plaintiffs, therefore, in opposition to the
defendants' motions to dismiss, to allege facts supporting their
entitlement to the savings statute. Those facts needed to be
presented by "pleadings, affidavits, or other documents presented
to the motion judge for [her] consideration *in some proper man-
ner*" (emphasis added). *Granahan* v. *Commonwealth*, 19 Mass.
App. Ct. 617, 620 n.5 (1985).

It is important to identify what was and was not properly
before the Superior Court judge. During the hearing, plaintiffs'
counsel handed the judge a transcript of the Delaware hearing[29]
and asked that she take judicial notice of its contents. Relying
on *Rodi*, 389 F.3d at 18-19, counsel asked the judge to take
judicial notice (1) that some defendants moved to dismiss the
claims against them for lack of personal jurisdiction in Dela-
ware; (2) that during the hearing, the Vice Chancellor expressed
extreme skepticism from the bench about the plaintiffs'
jurisdictional theories; and (3) that the "plaintiffs essentially
didn't respond [to the motions] and decided to dismiss otherwise
consistent with the court's discussion on the record that

---

[29]The hearing regarded the motions to dismiss for lack of personal juris-
diction.

everybody, you know, that one of the options is to file in Massachusetts.''

Even were we to accept the idea that Mass.R.Civ.P. 12(b)(6) permits consideration of matters outside the four corners of the complaint provided they are susceptible to judicial notice, see *Rodi*, 389 F.3d at 12, judicial notice could not be taken of the plaintiffs' reasons for dismissing their claims — essentially questions of motivation and state of mind.[30] See *Day* v. *Crowley*, 341 Mass. 666, 670 (1961) (undisclosed basis for prior decree cannot be judicially noticed). ''Matters are judicially noticed only when they are indisputably true.'' *Nantucket* v. *Beinecke*, 379 Mass. 345, 352 (1979). Moreover, ''[a]lthough we may take judicial notice of the docket entries and papers filed in separate cases, we may not take judicial notice of facts or evidence brought out in those separate actions.'' *Home Depot* v. *Kardas*, 81 Mass. App. Ct. 27, 28 (2011). Thus, the contents of the Delaware transcript were not amenable to judicial notice. In addition, the judge was not required to consider materials, such as the Delaware transcript, that were not included with the papers on file, or attested to by way of affidavit, and were only handed to her informally during the hearing. The transcript of the Delaware hearing was not properly before the judge, and she correctly recognized that she could not take judicial notice of its contents.

Because the plaintiffs did not submit an affidavit stating the reasons why they dismissed the Delaware suit, the only remaining items that can be considered are the documents attached to the plaintiffs' opposition to the motion to dismiss, namely, the Delaware complaint, the Delaware order allowing only limited jurisdictional discovery, and the Delaware order of dismissal.[31] These documents do not state why the plaintiffs voluntarily dismissed the Delaware suit. However, their chronology demonstrates that the plaintiffs voluntarily dismissed their claims after some defendants moved to dismiss for lack of personal jurisdic-

---

[30]For an extensive list of matters on which a court may take judicial notice, see the tables in Young, Pollets, & Poreda, Annotated Guide to Massachusetts Evidence § 201, at 43-54 (2012-2013 ed.).

[31]Because the defendants do not raise it, we pass on whether these documents, which were not submitted by affidavit, were properly before the motion judge.

tion and after the court largely denied the plaintiffs' motion for jurisdictional discovery from those defendants. In addition, the voluntary dismissal was made without any consideration, shortly after the adverse discovery ruling, and before the plaintiffs' opposition to the motions to dismiss was due. This chronology raises a question of fact sufficient to survive a motion to dismiss that, as to the four defendants who challenged personal jurisdiction in Delaware, the plaintiffs dismissed their claims because they had an objectively reasonable expectation that the court would dismiss those claims on that ground. By contrast, the record is silent as to the plaintiffs' reason for dismissing their claims against the defendants who did not challenge jurisdiction. And, given that those defendants did not challenge jurisdiction, it is impossible to conclude or infer that the plaintiffs held an objectively reasonable belief that their claims against those defendants would be dismissed by the court for lack of personal jurisdiction.

As a result, the three-year claims against DCM, Novielli, Smith, and Leighton (who did not challenge personal jurisdiction in Delaware) are not entitled to the protection of the savings statute.[32] The three-year claims against Dutchess Advisors, Sullivan Bille, and Dundee Leeds[33] (all of whom moved to dismiss for lack of personal jurisdiction) are entitled to that protection at the motion to dismiss stage. Put another way, count I (breach of fiduciary duty) as brought derivatively on behalf of Dutchess Ltd. against DCM, Novielli, Smith, and Leighton; count IX (unjust enrichment) as against Dutchess Advisors; count X (professional malpractice) against Sullivan

---

[32]For clarity, we specify that the following counts of the complaint were correctly dismissed on statute of limitations grounds: so much of count I as was brought derivatively on behalf of Dutchess L.P.; count II; count III; count V; count VI; count VII[1]; count VII[2]; and count IX as against DCM, Novielli, Smith, and Leighton.

[33]See note 22, *supra.* For purposes of this appeal, the claim against Dundee Leeds has been accepted to be subject to the Cayman Islands six-year limitations period. We include Dundee Leeds in the list of parties here only because it moved to dismiss for lack of personal jurisdiction in the Delaware action. Therefore, if it develops in the litigation on remand that the claim against Dundee Leeds, after a choice-of-law analysis, is instead subject to the Massachusetts three-year limitations period, the claim would nonetheless be eligible for the savings statute.

Bille; and count XI (professional malpractice) against Dundee Leeds are not subject to dismissal at this point as time barred.

b. *Remaining issues.* We turn next to the defendants' additional arguments.[34] They are (1) that the plaintiffs lack standing under Cayman law to assert a claim for breach of fiduciary duty (count I) derivatively on behalf of Dutchess Ltd., (2) that the complaint fails to allege sufficiently both duty and causation with respect to the professional malpractice claim (count X) against Sullivan Bille, and (3) that the plaintiffs have failed to make a prima facie showing of personal jurisdiction over Dundee Leeds (count XI). We are unpersuaded.

i. *Derivative standing under Cayman law.* Because Dutchess Ltd. is a Cayman Islands corporation, Cayman law determines whether the plaintiffs have standing to bring a claim derivatively on its behalf. See *Harrison* v. *NetCentric Corp.*, 433 Mass. 465, 471 (2001) ("[T]he State of incorporation dictates the choice of law regarding the internal affairs of a corporation"). Under Cayman law,[35] derivative claims may not be pursued unless one of a few recognized exceptions applies, one of which is fraud on the minority. *Winn* v. *Schafer*, 499 F. Supp. 2d 390, 396 (S.D.N.Y. 2007). See *Foss* v. *Harbottle*, (1843) 67 Eng. Rep. (Ch.) 189, 207-208. To fall within this exception, the alleged wrongdoers must have "control" of the corporation, and commit a "fraud" against it. *Schultz* v. *Reynolds*, [1992-1993] C.I. L.R. 59, 72, 77, 79.

"Control" in this context is not limited to ownership of a majority of stock. Control can also be found where the wrongdoers have de facto control of the corporation. See *In re Tyco Intl., Ltd.*, 340 F. Supp. 2d 94, 99 (D.N.H. 2004) (applying English law); *Schultz, supra* at 80 ("[R]eality has to be taken into account in deciding control"). "Fraud" occurs either when "directors who control a company have improperly appropri-

---

[34]Of the remaining claims, only one (the unjust enrichment claim against Dutchess Advisors, count IX) is not challenged on some additional ground.

[35]Cayman law is the common law of Britain and other Commonwealth countries, supplemented by Cayman Islands court decisions and statutes. See *Schultz* v. *Reynolds*, [1992-1993] C.I.L.R. 59 (citing various British decisions). See also *In re Tyco Intl., Ltd.*, 340 F. Supp. 2d 94, 96 & n.3 (D.N.H. 2004) (proper in case under Bermuda law to consult law of other Commonwealth nations).

ated to themselves money, property or advantages which belong to the company" or when "directors though acting 'in the belief that they were doing nothing wrong' . . . are guilty of a breach of duty to the company . . . and as a result . . . obtain some benefit." *Schultz, supra* at 71, quoting from *Prudential Assur. Co.* v. *Newman Indus. Ltd. (No. 2),* [1981] 1 Ch. 257, 316 (Eng.). It is essential that the plaintiff show that the party who committed fraud in this sense benefit from his conduct. *Schultz, supra* at 72, 78-79.

The defendants do not challenge the motion judge's determination that the complaint sufficiently alleges benefit to Novielli, Leighton, and Smith. Nor do the defendants dispute that DCM had control over Dutchess Ltd. Instead, the defendants contend that the complaint does not sufficiently allege that DCM obtained a benefit, or that Novielli, Smith, and Leighton had control over Dutchess Ltd. "[W]e examine the same pleadings as the motion judge and therefore proceed de novo. Those pleadings include . . . documents that are referenced in the complaint[] and that were provided to the motion judge. We accept as true the allegations in the complaint[] and draw every reasonable inference in favor of the plaintiffs. We consider whether the factual allegations in the complaint are sufficient, as a matter of law, to state a recognized cause of action or claim, and whether such allegations plausibly suggest an entitlement to relief." *Boston Med. Center Corp.* v. *Secretary of the Executive Office of Health & Human Servs.,* 463 Mass. 447, 450 (2012) (citations and quotation marks omitted).

Taken as a whole, the complaint sets out a hedge fund master-feeder system controlled, managed, and directed by the three individual defendants using various corporate entities. For example, Smith has held various high-level offices within DCM (which owns the voting shares of Dutchess Ltd.), is the director of corporate finance for Dutchess L.P. (one of the feeder funds), and is the vice-president of business development for Dutchess Advisors. Novielli and Leighton are the only two members of the board of directors of Dutchess Ltd. (the sister feeder fund). They are also the sole directors of the master fund. In addition, Novielli and Leighton are the principals and comanaging members of DCM, which in turn owns the voting shares of

Dutchess Ltd.[36] DCM directs the investment program of the master fund, and it is also the investment manager of Dutchess Ltd. It is a reasonable inference to draw from these allegations that Novielli and Leighton have control over Dutchess Ltd. sufficient to withstand a motion to dismiss.

Although the question is closer, we are also of the view that the allegations concerning Smith's involvement, taken in their totality, are sufficient to show his de facto control over Dutchess Ltd., at least for pleading purposes. In addition to his roles within the various interrelated entities, Smith acted in concert with Novielli and Leighton on both sides of a transaction designed to artificially inflate the value of the master fund, increase the value of their personal holdings, and increase the amount of management and performance fees that would inure to their benefit — all to the harm of Dutchess Ltd. Smith was also able to appropriate portions of the investments of Dutchess Ltd. for himself (and others) by forcing target companies to retain a consulting firm's services, resulting in fees for himself and in disregard of the best interests of Dutchess Ltd.

The complaint also alleges that DCM benefited at the expense of Dutchess Ltd. by structuring sham transactions designed to increase DCM's management fees and fees on profits. Because DCM received a two percent management fee per year on the investments in Dutchess Ltd., and a twenty percent fee on Dutchess Ltd. profits, it benefited by creating falsely inflated values for Dutchess Ltd.'s assets and profits.

Because both control and benefit are sufficiently alleged, the plaintiffs have established derivative standing to sue DCM, Novielli, Smith, and Leighton on behalf of Dutchess Ltd. under Cayman law.

ii. *Sufficiency of the allegations against Sullivan Bille.* Sullivan Bille argues that the complaint fails to state a cause of action for which relief may be granted because (1) Sullivan Bille

---

[36]The defendants argue that there is nothing in the complaint that sheds light on the "stock ownership" of DCM. But DCM is a Connecticut LLC and therefore, under Connecticut law, controlled through membership interests (or appointed managers), not stock. See Conn. Gen. Stat. §§ 34-140, 34-142 (2013). The plaintiffs sufficiently allege control of DCM by stating that Novielli and Smith are the comanaging members of DCM.

had no duty to determine whether Dutchess L.P. was acting in accordance with its publicly represented investment strategies, goals, and policies; and (2) even accepting that Sullivan Bille breached such a duty, there was no cognizable harm. We disagree.

(a) *Duty*. Sullivan Bille's argument that it had no duty to determine whether Dutchess L.P.'s investments were made in accordance with the investment strategies and protocols identified in the "Private Offering Memorandum" is a red herring, and depends upon ignoring the well-pleaded allegations of the complaint. The complaint alleges that Sullivan Bille's "audit reports were false and negligently prepared . . . because the financial statements did *not* conform with GAAP [Generally Accepted Accounting Principles], contained material misstatements and omissions, failed to portray the true financial condition, and the audits had not been conducted in accordance with GAAS [Generally Accepted Auditing Standards]." The complaint identifies two ways in which Sullivan Bille violated GAAP: (1) the investment valuations of Siena and Challenger were materially overstated, and (2) the financial statements prepared by Sullivan Bille failed to disclose that management did not comply with investment objectives and policies. Sullivan Bille does not dispute that it was required to comply with GAAP and GAAS. It argues, however, that GAAP and GAAS do not impose the duty alleged by the plaintiffs. This is a question for another day. The requirements of GAAP and GAAS and measuring Sullivan Bille's performance against them are issues that cannot be determined within the confines of the complaint. Both depend upon factual development not suitable to a motion to dismiss.

(b) *Causation*. Sullivan Bille's argument regarding causation is similarly ill suited for disposition on a motion to dismiss. Sullivan Bille argues that any false or negligently prepared financial statement would have been based on information provided to it by an agent of Dutchess L.P. Therefore, relying in part on the theory of in pari delicto,[37] Sullivan Bille argues the Dutchess L.P. plaintiffs (who bring suit derivatively) could not have justifiably relied on Sullivan Bille's audits. And because

---

[37]"The doctrine of in pari delicto bars a plaintiff who has participated in wrongdoing from recovering damages for loss resulting from the wrongdoing." *Choquette* v. *Isacoff*, 65 Mass. App. Ct. 1, 3 (2005).

the Dutchess L.P. plaintiffs could not rely on Sullivan Bille's audits, Sullivan Bille contends that the audits could not possibly have caused them harm. This argument is made without citation to any relevant Massachusetts law.

Even assuming, arguendo, the legal viability of Sullivan Bille's theory, it fails at this stage because it requires factual development. Causation is a question of fact usually left to the jury. *Mullins* v. *Pine Manor College*, 389 Mass. 47, 58 (1983). Ordinarily, "[w]hen an agent acquires knowledge in the scope of [his] employment, the principal . . . is held to have constructive knowledge of that information." *Sunrise Properties, Inc.* v. *Bacon, Wilson, Ratner, Cohen, Salvage, Fialky & Fitzgerald, P.C.*, 425 Mass. 63, 66 (1997), quoting from *DeVaux* v. *American Home Assur. Co.*, 387 Mass. 814, 818 (1983). "However, an agent's knowledge of his own unauthorized acts is not imputed to the principal when the agent has acted fraudulently toward the principal and is engaged in an independent fraudulent act from which the principal does not benefit." *Sunrise Properties, Inc., supra* at 67. Here, the complaint plainly alleges fraud on the principal (Dutchess L.P.) by its agents (DCM, Novielli, Leighton, and Smith), who are alleged to have acted in their own self-interest to the harm of the principal. Accepting these allegations as true (as we must), we cannot say that knowledge of any misleading financial statements would necessarily be imputed to Dutchess L.P.

iii. *Personal jurisdiction over Dundee Leeds*. To determine if the plaintiffs have made a prima facie showing of personal jurisdiction over Dundee Leeds, we accept the factual allegations of the complaint as true. Dundee Leeds does not dispute any factual allegation, and submitted no affidavit showing its lack of contacts with Massachusetts. See *Cepeda* v. *Kass*, 62 Mass. App. Ct. 732, 737-739 (2004). At this stage of the proceedings, the plaintiffs have a burden of production, not persuasion. *Id.* at 738. Although the plaintiffs eventually will need to prove personal jurisdiction "by a preponderance of the evidence at an evidentiary hearing or at trial," at the pleading stage all that is required is a prima facie showing. *Ibid.* We deal here only with specific jurisdiction; no argument is made that general jurisdiction over Dundee Leeds is proper in Massachusetts.

Personal jurisdiction must be both authorized by State law and meet the requirements of due process under the United States Constitution. *Caplan* v. *Donovan*, 450 Mass. 463, 465, cert. denied, 553 U.S. 1018 (2008), citing *Good Hope Indus., Inc.* v. *Ryder Scott Co.*, 378 Mass. 1, 5-6 (1979). At issue first is whether Dundee Leeds's contacts with Massachusetts are sufficient to confer jurisdiction under the long-arm statute, G. L. c. 223A, § 3. The application of that statute "requires that (even if the fact pattern of the case is *constitutionally* acceptable) the circumstances of the particular case come within one of the *specific subsections* of c. 223A, § 3." *Burtner* v. *Burnham*, 13 Mass. App. Ct. 158, 161-162 (1982). If the defendant's conduct falls within one of the subsections of G. L. c. 223A, § 3, then jurisdiction will be exercised unless doing so would be inconsistent with the Constitution. *Good Hope Indus., Inc., supra.*

(a) *The long-arm statute.* The chief dispute is whether Dundee Leeds's conduct constituted "transacting any business" in the Commonwealth, thereby subjecting it to personal jurisdiction under G. L. c. 223A, § 3(*a*), inserted by St 1968, c. 760. "The term 'transacting business' is broadly construed," *Haddad* v. *Taylor*, 32 Mass. App. Ct. 332, 335 (1992), and "anything but the most incidental commercial contact" is sufficient. *Foster-Miller, Inc.* v. *Babcock & Wilcox Canada*, 848 F. Supp. 271, 276 (D. Mass. 1994), reversed on other grounds, 46 F.3d 138 (1st Cir. 1995). "The question what activities constitute the transaction of business . . . must be decided on the particular facts involved." *Stanton* v. *AM Gen. Corp.*, 50 Mass. App. Ct. 116, 117 (2000), quoting from *Droukas* v. *Divers Training Academy, Inc.*, 375 Mass. 149, 156-157 (1978). The claim must arise from business that the defendant transacted in the Commonwealth. *Tatro* v. *Manor Care, Inc.*, 416 Mass. 763, 767 (1994).

The complaint alleges that Dundee Leeds was the administrator for the two feeder funds and had "full access" to the funds' investment data. Among other things, Dundee Leeds oversaw, made, and distributed net asset value (NAV) calculations for the two feeder funds, both of which operated out of offices in Boston. Accepting these facts as true (as we must), it is difficult to see

how one could not reasonably infer that Dundee Leeds had regular communication with the funds' offices in Massachusetts, and that it gathered information that originated from the funds' offices in Massachusetts in order to prepare the NAV calculations. We are not required to imagine that Dundee Leeds performed its duties without regular contact with its two clients, who were located in Massachusetts.[38]

(b) *Due process.* Due process requires contacts with Massachusetts through some "purposeful[] avail[ment] . . . of the privilege of conducting activities" here. *Tatro, supra* at 772, quoting from *Asahi Metal Indus. Co.* v. *Superior Ct.*, 480 U.S. 102, 108-109 (1987). Any assertion of jurisdiction "must not offend 'traditional notions of fair play and substantial justice.' " *Tatro, supra* at 773, quoting from *International Shoe Co.* v. *Washington*, 326 U.S. 310, 316 (1945). The assertion of specific jurisdiction also requires that the plaintiffs' claim arise out Dundee Leeds's contacts with the forum. *Tatro, supra* at 772.

A liberal reading of the complaint permits the inference that Dundee Leeds purposefully availed itself of the benefits of conducting business in Massachusetts by agreeing to oversee feeder funds based in Massachusetts, harvesting data from them, having an ongoing relationship with them, and providing asset calculations for them. Dundee Leeds "reasonably could have foreseen that significant managerial decisions, based on the information it had provided, would be made in Massachusetts." *Good Hope Indus., Inc.*, 378 Mass. at 11-12. See *Bulldog Investors Gen. Partnership* v. *Secretary of the Commonwealth*, 457 Mass. 210, 218 (2010) (defendant knew it was communicating with Massachusetts residents and derived commercial benefit from the interaction). We also see nothing to suggest that exercising jurisdiction would be unfair or unduly burdensome to Dundee Leeds. Finally, the claim against Dundee Leeds arises from its relationship with its two feeder fund clients in Massachusetts.

4. *Conclusion.* For the reasons set out above, we vacate so much of the judgment as dismisses count I (breach of fiduciary duty) as brought derivatively on behalf of Dutchess Ltd., count

---

[38]Nothing in this opinion forecloses the possibility of discovery or other further factual development with respect to the jurisdictional issue. We deal here only with the plaintiffs' prima facie burden at this first stage of the litigation.

IX (unjust enrichment) as against Dutchess Advisors, count X (professional malpractice) against Sullivan Bille, and count XI (professional malpractice) against Dundee Leeds. We affirm the remainder of the judgment. The case is remanded for further proceedings consistent with this opinion.

*So ordered.*

APPENDIX.

The following chart outlines the claims asserted in the complaint, together with the identities of the parties asserting them and against whom they are asserted. Some misnumbering of counts occurred in the complaint: there are no counts numbered IV or VIII; and there are two counts numbered VII, which we refer to as counts VII(1) and VII(2).

| Count | Claim | Brought By | Direct or Derivative | Against |
|---|---|---|---|---|
| I | Breach of fiduciary duty | Dutchess Ltd. & Dutchess L.P. | Derivative | DCM, Novielli, Smith, & Leighton |
| II | Breach of contract | Dutchess L.P. plaintiffs | Direct | DCM |
| III | Breach of implied covenant of good faith and fair dealing | Dutchess L.P. | Derivative | DCM |
| V | Fraud | Dutchess Ltd. plaintiffs & Dutchess L.P. plaintiffs | Direct | DCM, Novielli, Smith, & Leighton |
| VI | Fraud | Dutchess Ltd. plaintiffs & Dutchess L.P. plaintiffs | Direct | DCM, Novielli, Smith, & Leighton |
| VII[1] | Negligent misrepresentation | Dutchess Ltd. plaintiffs & Dutchess L.P. plaintiffs | Direct | DCM, Novielli, Smith, & Leighton |
| VII[2] | Negligent misrepresentation | Dutchess Ltd. plaintiffs & Dutchess L.P. plaintiffs | Direct | DCM, Novielli, Smith, & Leighton |
| IX | Unjust enrichment | Dutchess Ltd. & Dutchess L.P. | Derivative | DCM, Dutchess Advisors, Novielli, Smith, & Leighton |
| X | Professional malpractice | Dutchess L.P. | Derivative | Sullivan Bille |
| XI | Professional malpractice | Dutchess Ltd. & Dutchess L.P. | Derivative | Dundee Leeds |