SULLIVAN, J.
*472 Corinna von Schönau-Riedweg (von Schönau), a Swiss citizen, inherited a considerable *101 fortune in the stock of Novartis International AG, a Swiss pharmaceutical company, upon her mother's death in 2002. She turned for advice to Baron Wilfrid von Plotho, a director of Rothschild Bank AG (Rothschild, RBZ, or bank), a Swiss bank, who suggested that he would assist in managing and investing her inheritance. She agreed, and von Plotho proposed, among other things, that she invest in various companies seeking private equity investors. Among the investments recommended were two Massachusetts-based companies, *473 Continuum Energy Technologies, LLC (CET), a science-based technology company, and C Change Investments, LLC (CCI), a venture capital firm. CET and CCI claimed to be on the cusp of scientific breakthroughs that would, among other things, change the composition of base metals.[3] Von Schönau and her holding company, Ebur Investments, LLC (collectively, von Schönau), invested approximately $ 39 million in these two companies. When her investments proved worthless, she sued (among others) CET, CCI, Rothschild, von Plotho, John Preston (a founder of both CET and CCI), and Michael Porter (a manager of CET).[4]
Default judgment entered against von Plotho and his holding company, ARA Management Corporation (ARA Management).[5] After extensive motion practice, in which a judge of the Superior Court was deluged with a voluminous record and multiple briefs, Rothschild was dismissed for lack of personal jurisdiction. Later, a different judge granted summary judgment for CET, CCI, and Porter, and for Preston with respect to the CET- and CCI-related claims against him.[6] Remaining claims concerning two other companies and Preston's involvement with those companies went to trial, resulting in a defendants' verdict.
Von Schönau appeals from so much of the final judgment as dismissed Rothschild for lack of personal jurisdiction, entered judgment for CET (and for Preston and Porter on the CET-related claims against them) on statute of limitations grounds, and entered summary judgment for CCI and Preston on the merits. Von Schönau does not appeal from the jury verdict. We vacate so *474 much of the judgment as dismissed Rothschild for lack of personal jurisdiction, concluding that von Schönau has made a prima facie showing that von Plotho was Rothschild's agent, such that von Plotho's contacts with Massachusetts could be attributed to Rothschild. We remand for an evidentiary hearing or trial on the issue of personal jurisdiction. In all other respects, the judgment is affirmed.
Background. We summarize the evidence relevant to the dispositive motions *102 in the light most favorable to von Schönau, reserving additional facts for later discussion. See Cepeda v. Kass, 62 Mass. App. Ct. 732, 737-738, 819 N.E.2d 979 (2004) (personal jurisdiction). See also Boazova v. Safety Ins. Co., 462 Mass. 346, 350, 968 N.E.2d 385 (2012) (summary judgment). Because the sequence of events is relevant to both personal jurisdiction over Rothschild and the applicability of the statute of limitations to the CET-related claims, we summarize the facts related to CET with particular attention to chronology. We summarize the facts concerning CCI's conduct separately.
1. Von Plotho, Rothschild, and von Schönau's investments in CET. In 2002, von Schönau inherited stock in Novartis worth approximately 573 million Swiss francs, an amount the parties estimate to be worth approximately $ 500 million or more in today's dollars. Von Plotho, a Swiss and German citizen, was an employee of Rothschild, and a long-time acquaintance of von Schönau's. While employed by Rothschild, von Plotho approached von Schönau about diversifying her holdings, selling some unspecified (but substantial) portion of her Novartis shares, and moving her money to Rothschild. Von Plotho advised her to invest in both CET and CCI.
In early 2003, von Schönau met with von Plotho at a Rothschild office in Switzerland. Thereafter, in 2003 and 2004, she opened a total of six accounts at Rothschild. Only two of those accounts are at issue here. Account number 20200 (20200 account) was designated for private equity investments. Account number 12000 (12000 account) was designated for investment in European bonds, although it was also later used for private equity investments.
Von Schönau signed an "Asset Management Mandate" for the 12000 account in January 2003.[7] She also signed an "Extension of the Asset Management Mandate," which stated:
*475 "In addition to the above provisions of the Asset Management Mandate, the Account Holder gives the Bank the express authority to perform non-traditional investment types in its own discretion (such as for example Hedge Funds or similar investment instruments) including investment instruments which do not fall within the definition of the standard banking investment types pursuant to the Guidelines of the Swiss Bankers' Association" (emphasis added).
In May 2003, von Schönau opened the 20200 account and signed an "Asset Management Mandate" that did not include the above-quoted extension for nontraditional investments. Von Schönau paid fees to Rothschild in connection with both accounts. Although Rothschild submitted affidavits stating that private equity investments were not permitted for bank-managed assets (at least not without the written direction of the client), there is no indication in the record that Rothschild communicated this to von Schönau.
At the same time, in Massachusetts, Preston and a scientist named Christopher Nagel were working on establishing a new company called Atomic Ordered Materials LLC (AOM). Incorporated in 1999, AOM (later called CET)[8] was in the business of *103 "researching, developing, and attempting to commercialize experimental technologies based on electromagnetic chemistry and modification of the electronic structure of elements." In somewhat plainer English, the company's goal was to change the composition of base metals for commercial purposes.
At some point in 2003, von Plotho was introduced to Preston. In October 2003, von Plotho traveled to the Boston area to meet with Preston and others in Massachusetts regarding CET. Von Plotho was Preston's house guest for at least part of that trip. According to minutes from the meeting, "It was concluded that Baron von Plotho will investigate the possibility of a financing through one of his clients. If this is successful, it will satisfy the needs of the company." All told, over the next seven years, von Plotho made five separate visits to Massachusetts with von *476 Schönau to investigate and monitor private equity investments in CET, CCI, and other companies.
After the October 2003 meeting, Preston sent a letter to von Plotho at his Rothschild business address in Zurich, to which he attached a description of CET "that should be appropriate for your discussion with the potential investor." By December 31, 2003, von Plotho had discussed a potential investment in CET with von Schönau.
On January 6, 2004, von Plotho sent a letter to Preston via a facsimile number in the 508 area code, in which he confirmed von Schönau's interest in investing $ 10 million in CET. On January 15, 2004, Preston sent a letter by facsimile to von Plotho at Rothschild offering to sell von Schönau a two percent interest in CET for $ 10 million.
On January 23, 2004, von Schönau entered into a share purchase agreement with CET by which she agreed to buy a two percent interest in CET for $ 10 million. At the time, according to von Schönau, although other employees at Rothschild "advised on other types of investments, ... only von Plotho was recommending private equity investments to her."
Prior to von Schönau's execution of the share purchase agreement, von Plotho told her that, according to Preston, CET had developed technology that could allow it to change elements in metals, and that the company was "roughly six-to-nine months or up to a year away" from generating profits. Accordingly, when von Schönau made her initial investment in CET, she was under the impression that the production and sale of products using its technology was "imminent."
Shortly thereafter, von Schönau met Preston in Switzerland for the first time. During that meeting, Preston told her that CET was "only one or two tests away from a 'major breakthrough.' " By February 10, 2004, her $ 10 million payment had been received by CET from the 20200 (private equity) account.
Sometime before March 1, 2004, the three managers of CET -- Preston, Nagel, and Porter -- offered share options to certain people, including CET's academic advisors and von Plotho. Preston also offered von Plotho membership on a CET advisory board. On March 3, 2004, von Plotho signed a mutual nondisclosure agreement with CET, including a choice of law clause stating that the agreement "shall be governed by the laws of the Commonwealth of Massachusetts with the exception of its conflict of laws rules." In an internal Rothschild memorandum dated *477 April 21, 2004, von Plotho disclosed that he had been invited to join the CET advisory board and stated that he "agreed in princip[le] and subject to approval by [Rothschild's] *104 Management Committee as well as Board."[9]
In May 2004, von Schönau and von Plotho traveled to Massachusetts and attended meetings in Fall River and Boston with Preston, Nagel, and Porter. Von Schönau discussed the CET investment with von Plotho on this trip.[10] During the May 2004 meeting, von Schönau was again told that CET was a step away from a breakthrough that would result in a commercial profit.
In June 2004, von Schönau began to compensate von Plotho separately. She transferred shares in CET valued at $ 1 million to ARA Overseas Ltd. (ARA Overseas), an offshore holding company organized under the laws of the British Virgin Islands and owned by von Plotho and his wife.[11] A letter signed by von Schönau in June 2004 stated that the transfer was a gift. However, von Schönau later stated it represented a "finder's fee" in the form of ten percent of the shares she had purchased in CET. In 2005, she signed a letter indicating that she had promised von Plotho a "brokerage fee" of ten percent for his role in private equity investments.
Von Plotho's complicated role became ever more complicated on March 21, 2005, when, in a letter to von Plotho concerning another investment, von Schönau stated, "It is fully clear to me that this, as well as past and future private equity investments do not constitute investment recommendations made by Rothschild Bank AG." However, von Schönau's affidavit, which we must credit for purposes of these motions, stated that von Plotho dictated this letter to her and told her that she was required to sign it. She averred that she thought the letter would help von Plotho obtain recognition for his contributions as an employee of Rothschild, but that she still understood that Rothschild, where von Plotho was employed, was "advis[ing] me concerning private *478 equity investments." That same month, von Schönau and von Plotho again traveled to Boston and Fall River to meet with Preston, where they continued to discuss the CET investment. Then, in November 2005, von Schönau signed an extension of the asset management mandate for the 20200 account including the language giving Rothschild authority to invest in "non-traditional investment types" that had already appeared in the agreement for the 12000 account.
Shortly thereafter, however, von Schönau began the process of transferring her private equity business from Rothschild to another entity. According to a Rothschild bank record, at a December 13, 2005 visit in Basel, Switzerland, von Schönau indicated "that she wants to pull out the private equity investments from the above [20200] account, in order to give them to a family office for management.... We will be receiving a letter shortly that will outline this transfer order." On December 21, 2005, von Schönau signed a letter addressed to von Plotho which stated:
"In the past months you assisted me in successfully building up my investments in the private equity field....
*105 "These investments have since reached such considerable volumes that I have decided to reorganize their management. As part of this necessary reorganization, the management of my investments is being transferred to a Family Office of ATAG Private Client Services AG, Basel, which implies the transfer of all related documents and securities. I kindly request that you take all the necessary steps to ensure that this transfer is carried out as per the start of 2006....
"I would like to take this opportunity to thank you again for your assistance in building up my investments and herewith expressly discharge you, the Rothschild Bank AG and their staff in connection with all related activities. I highly appreciate that I may continue to rely on your advice" (emphasis added).
The 20200 account was closed as of December 2005. The 12000 account at Rothschild remained open and appears to have been treated primarily as a cash account to fund private equity investments. Von Schönau sent a letter dated January 19, 2006, to Preston stating that future mailings related to her private equity investments should go to the office of ATAG Private Client *479 Services AG (ATAG) in Basel. Nonetheless, von Plotho, while still a Rothschild employee, remained involved.
Von Schönau attended a meeting in Fall River in February 2006, with von Plotho, Preston, and Nagel, where she was again told that "various tests had been performed and that the breakthrough will come in a couple of months." On May 24, 2006, von Schönau signed a second share purchase agreement with CET in which she agreed to purchase another 0.767 percent interest in the company (59,302 shares) for $ 4 million. Before von Schönau signed this agreement, Preston and von Plotho told her that CET was six months away from having a commercial product. As of May 2006, however, von Schönau knew that CET had not yet developed any commercial products, despite its prior optimistic predictions to the contrary. Von Schönau's second, $ 4 million investment in CET was paid in three separate installments of $ 1,333,333 each, made in June 2006, June 2007, and June 2008. These payments all came from the 12000 account.
On June 8, 2006, von Schönau attended a meeting in London concerning CET, also attended by von Plotho and Preston. Von Schönau confirmed at deposition that by that June 8, 2006 meeting, she knew that the breakthrough she had repeatedly been promised had not yet occurred. According to von Schönau, she was again told, "[T]he breakthrough ... [is] imminent and ... only a few more tests need to be conducted to make the result commercially viable."
Later in June, von Schönau signed a "Financial Consulting" agreement with von Plotho, agreeing to pay him 500,000 Swiss francs annually, plus expenses and value added tax, for his investment advice. She also continued to pay von Plotho an additional fee in the form of ten percent of all private equity shares she acquired.
On August 31, 2006, von Plotho retired from his employment at Rothschild. That same month, von Plotho signed a consulting agreement with Rothschild effective September 1, 2006.[12] By September 12, *106 2006, von Plotho had an office at ATAG in Basel, *480 Switzerland, paid for by von Schönau. Both before and after his retirement von Plotho had Rothschild business cards, access to Rothschild stationery, a Rothschild e-mail address, use of a secretary or administrative assistant at Rothschild, and the ability to receive communications (telephone messages and mail) through Rothschild.
During the length of her client relationship with Rothschild, von Schönau attended many regularly scheduled meetings with von Plotho at bank offices, usually in Zurich. Often, but not always, other bank employees attended. From July 3, 2003, through January 12, 2006, the bank's records consistently listed von Plotho as attending these routine meetings "on our side." Beginning with a meeting held on September 28, 2006, the records consistently listed him as attending the meetings "on their side."[13]
At various times between February 2004 and December 2008, Preston provided von Schönau (personally or through von Plotho) with tax documents and profit and loss statements that showed CET was not profitable and had, in fact, incurred losses. From at least 2008 forward, many of these documents were housed at ATAG's office and were available for review by von Schönau (and by ATAG employees working on her behalf).[14] In December of 2008, Preston represented that with respect to CET, "[w]e anticipate making first sales of products in 2009." As far as the record reveals, however, CET did not produce or sell a commercial product, turn a profit, or pay dividends to investors.
In 2007 and 2008, CET continued to tell von Schönau (and other investors) that a breakthrough allowing commercialization of its technology was just around the corner. In a May 5, 2007 e-mail to von Schönau, von Plotho, and others, Preston wrote: "We have been making considerable progress at [CET] and believe we now have a strategy that will enable us to release an *481 interesting new product." In an April 20, 2008 letter to "[CET] Owners" regarding an upcoming meeting in Fall River that von Schönau subsequently attended, Preston wrote, "We have made significant progress in the fundamental science, which is helping us write new run plans to achieve target." However, von Schönau was aware in November 2008 that CET had not been able to produce a commercial product.
Nonetheless, von Schönau contends that she did not know the extent of her losses from her investment in CET until after July 2011. At that time she was reorganizing her financial affairs. For tax purposes, her advisors required a valuation of von Schönau's private equity interests.[15] This *107 process, von Schönau claims, revealed to her for the first time that her investments in CET and CCI were nearly worthless.
Until that time, von Schönau had placed trust and confidence in von Plotho. In connection with the reorganization of her financial holdings, however, von Plotho was forced to disclose that he had been avoiding paying taxes on his holdings in CET and CCI. Von Schönau then terminated her business relationship with him.[16] More than a year later, on December 27, 2012, von Schönau commenced suit in Massachusetts against Rothschild, von Plotho, CET, CCI, Preston, and Porter.
2. Von Schönau's failed investment in CCI. In March 2008, Preston and Russel Read co-founded CCI. Read and Preston's ambitious goal was to raise a billion dollars in funds to be invested in "transformative energy and materials technologies." They appear to have contemplated a symbiotic relationship between CET and CCI. CET itself (and, thus, its shareholders) held an ownership stake in CCI. Read and Preston were enthusiastic about CCI's prospects and told von Schönau that they had excellent contacts that would enable them to raise money fast.
In April 2008, von Schönau signed a subscription agreement confirming her intention to invest $ 25 million in CCI. According to CCI's operating agreement, von Schönau obtained a ten percent *482 interest in exchange for her investment. Von Schönau immediately paid the first $ 10 million that she had committed to CCI, via the 12000 account. Thereafter, von Schönau's remaining payments to CCI were made in two installments of $ 7.5 million each, paid later in 2008 and in 2009. In addition, von Schönau entered into a note purchase agreement with CCI dated September 30, 2009, in which she agreed to loan CCI up to $ 15 million.
Von Schönau attended three meetings concerning CCI between May 2008 and November 2008 in Fall River and Zurich. In a memorandum dated November 16, 2008, Read and Preston wrote to von Schönau, von Plotho, and others, "Despite the financial turmoil, we seem to be in an excellent position to grow [CCI] into a significant fund[,] ... and we have more truly excellent opportunities than we have time to close these deals." CCI was not able to meet its fundraising goals, and the company proved unsuccessful.[17]
Discussion. 1. Personal jurisdiction over Rothschild. As a nonresident defendant,[18] Rothschild is subject to the authority of a Massachusetts court only where the requirements of the Commonwealth's long-arm statute, G. L. c. 223A, § 3, and the due process clause of the Fourteenth Amendment to the United States Constitution have been met. Exxon Mobil Corp. v. Attorney Gen., 479 Mass. 312, 314, 94 N.E.3d 786 (2018). The core of von Schönau's complaint against Rothschild, from which all of her many claims extend, is that von Plotho gave her bad investment advice. Rothschild's liability for this advice is predicated *108 on three theories: (1) von Plotho was its actual or apparent agent acting within the scope of his relationship with Rothschild; (2) Rothschild failed to adequately supervise von Plotho; and (3) Rothschild failed in its own separate duty to safeguard von Schönau's investments.
There is no claim that Rothschild's activities in Massachusetts reach the volume required for an assertion of general jurisdiction. See Exxon Mobil Corp., 479 Mass. at 314, 94 N.E.3d 786. Rather, we are presented *483 with a question of specific jurisdiction, predicated on von Plotho's contacts in Massachusetts. See id. at 315, 94 N.E.3d 786 (specific jurisdiction requires "an affiliation between the forum and the underlying controversy" [quotation and citation omitted] ); Cannonball Fund, Ltd. v. Dutchess Capital Mgt., LLC, 84 Mass. App. Ct. 75, 97, 993 N.E.2d 350 (2013) ; G. L. c. 223A, § 3.
The judge concluded that von Plotho's contacts with Massachusetts were sufficient to support long-arm jurisdiction over him. The parties do not directly quarrel with that conclusion on appeal. The propriety of long-arm jurisdiction over Rothschild therefore turns on whether von Plotho was Rothschild's actual or apparent agent, such that his contacts in the Commonwealth can be attributed to the bank. See, e.g., Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A., 290 F.3d 42, 55 (1st Cir. 2002).
"When, as here, the assertion of in personam jurisdiction has been challenged ... a plaintiff must make a prima facie showing of evidence that, if credited, would be sufficient to support findings of all facts essential to personal jurisdiction." Fern v. Immergut, 55 Mass. App. Ct. 577, 579, 773 N.E.2d 972 (2002). See Cepeda, 62 Mass. App. Ct. at 737, 819 N.E.2d 979. Inquiries regarding personal jurisdiction are fact-sensitive. See Good Hope Ind., Inc. v. Ryder Scott Co., 378 Mass. 1, 2, 389 N.E.2d 76 (1979). "In conducting the requisite analysis under the prima facie standard, we take specific facts affirmatively alleged by the plaintiff as true (whether or not disputed) and construe them in the light most congenial to the plaintiff's jurisdictional claim." Cepeda, supra at 738, 819 N.E.2d 979, quoting Massachusetts Sch. of Law at Andover, Inc. v. American Bar Ass'n, 142 F.3d 26, 34 (1st Cir. 1998).
Unless and until an evidentiary hearing is held, "a prima facie showing suffices, notwithstanding any controverting presentation by the moving party, to defeat the motion." Cepeda, 62 Mass. App. Ct. at 738, 819 N.E.2d 979, quoting Marine Midland Bank, N.A. v. Miller, 664 F.2d 899, 904 (2d Cir. 1981). Where a court denies a motion pursuant to Mass. R. Civ. P. 12 (b) (2), 365 Mass. 754 (1974), without holding an evidentiary hearing, "[u]se of this prima facie standard ... preliminarily reserves the jurisdictional issue, unless waived by the defendant, for final determination at the [evidentiary hearing or] trial, pursuant to a preponderance of the evidence standard." Cepeda, supra at 737, 819 N.E.2d 979. It is up to the judge, in his or her discretion, to determine whether to hold an evidentiary hearing or instead defer the issue of jurisdiction until it is combined with trial on the merits. See id.
*484 Here, the motion judge allowed Rothschild's motion to dismiss pursuant to rule 12 (b) (2), based on jurisdictional facts set forth in affidavits and documents, without holding an evidentiary hearing. The question before us is whether the judge correctly concluded that those facts did not amount to a prima facie showing of actual or apparent agency -- crediting von Schönau with all facts as to which she has provided evidence (whether disputed or not), and giving her the benefit of all reasonable inferences. See *109 Diamond Group, Inc. v. Selective Distrib. Int'l, Inc., 84 Mass. App. Ct. 545, 548, 998 N.E.2d 1018 (2013) ; Cepeda, 62 Mass. App. Ct. at 737-738, 819 N.E.2d 979 ; Fern, 55 Mass. App. Ct. at 580 n.7, 773 N.E.2d 972. Because the sufficiency of the evidence under the prima facie standard presents a question of law, we review the motion judge's original decision on the motion to dismiss de novo. See Massachusetts Sch. of Law, 142 F.3d at 33-34.
An additional procedural consideration informs our review. After the motion to dismiss was allowed, von Schönau, who had been denied jurisdictional discovery in this case, obtained additional documents in the related Swiss litigation (see note 4, supra ).[19] She then moved for relief from the order of dismissal on the grounds of newly discovered evidence. See Mass. R. Civ. P. 60 (b) (2), 365 Mass. 828 (1974). The judge considered the additional evidence, but denied the motion to reconsider. We review that order for an abuse of discretion or error of law. See Cahaly v. Benistar Prop. Exch. Trust Co., 451 Mass. 343, 362, 885 N.E.2d 800, cert. denied, 555 U.S. 1047, 129 S.Ct. 637, 172 L.Ed.2d 612 (2008).[20]
a. Actual authority, ratification, or apparent authority. The bank maintains that actual (or apparent) authority may be created only by "manifestations of the principal," see *485 Restatement (Third) of Agency § 2.03 comment c, at 114 (2006), and that von Plotho's conduct toward von Schönau, whatever it may have been, is simply insufficient to make a prima facie showing of agency. See Theos & Sons, Inc. v. Mack Trucks, Inc., 431 Mass. 736, 745, 729 N.E.2d 1113 (2000). To the contrary, on this record, von Schönau has made a prima facie showing that von Plotho was Rothschild's agent, whether on a theory of actual authority, ratification, or apparent authority, to recommend private equity investments in Massachusetts on Rothschild's behalf.
i. Actual authority. "Actual authority, either express or implied, is the agent's power to affect the principal's relations with third parties as manifested to the agent by the principal." Theos & Sons, 431 Mass. at 743-744, 729 N.E.2d 1113. "Actual authority results when the principal explicitly manifests consent, either through words or conduct, that the agent should act on behalf of the principal.... Implied authority is actual authority that evolves by implication from the conduct of the parties." Id. at 743 n.13, 729 N.E.2d 1113.
Von Plotho's employment agreement with Rothschild stated that he was hired to be an investment advisor; it contained no explicit prohibition against providing private equity investment advice. In *110 its motion to dismiss, however, Rothschild submitted affidavits stating that providing private equity recommendations to von Schönau was not within the scope of von Plotho's consultancy agreement after his retirement, and that while employed by Rothschild, private equity investments in individual companies were not permitted without the express written consent of the client. Von Plotho claimed that he told von Schönau that the bank had no role in recommending the private equity investments, and that his advice to her on the investments was outside the scope of his bank responsibilities.[21]
Internal Rothschild documents disclosed to von Schönau in the Swiss litigation, after the motion to dismiss in this case was initially allowed, permit the inference that Rothschild was fully aware of von Plotho's private equity recommendations, and blessed them. "Visit Reports" on Rothschild letterhead dated January 19, 2005, for both the 12000 and 20200 funds listed "WVP" as present on "our side" and stated:
As to the 12000 account: "The client ... takes note of the *486 statement of assets of 12/31/04 [and] is happy with the positive performance ...."
As to the 20200 account: "The client will receive periodic reports about the existing five private equity investments in the USA directly via RBZ, or the company representatives will come to Switzerland to inform the client in person about the development of the company" (emphasis added).
We fully recognize that the affidavits, internal documents, and von Schönau's correspondence are susceptible of conflicting interpretations, competing inferences, and differing credibility determinations, but for present purposes, von Schönau made a prima facie showing of actual authority. Based on the visit reports, a fact finder could find that Rothschild knew of, consented to, and participated in monitoring the private equity investments recommended by von Plotho, and that von Plotho therefore operated with the consent of Rothschild. See Restatement (Third) of Agency § 2.01. Contrast Theos & Sons, 431 Mass. at 744-745, 729 N.E.2d 1113.
ii. Ratification. Alternatively, even if von Plotho originally pursued the Massachusetts investments without Rothschild's authorization, a fact finder could determine that Rothschild ratified the conduct. "Where an agent lacks actual authority to agree on behalf of his principal, the principal may still be bound if the principal acquiesces in the agent's action, or fails promptly to disavow the unauthorized conduct after disclosure of material facts." Licata v. GGNSC Malden Dexter LLC, 466 Mass. 793, 802, 2 N.E.3d 840 (2014), quoting Linkage Corp. v. Trustees of Boston Univ., 425 Mass. 1, 18, 679 N.E.2d 191, cert. denied, 522 U.S. 1015, 118 S.Ct. 599, 139 L.Ed.2d 488 (1997). Here, the visit reports permit an inference of either Rothschild's passive acquiescence or its affirmative ratification, even if von Plotho's activities originally had been unauthorized.
iii. Apparent authority. The indicia of apparent authority present here are sufficient to make a prima facie showing. "Apparent authority holds a principal accountable for the results of third-party beliefs about an actor's authority to act as an agent when the belief is reasonable and traceable to a manifestation of the principal."
*111 Restatement (Third) of Agency § 2.03 comment c, at 114. See Daynard, 290 F.3d at 56, quoting H.G. Reuschlein & W.A. Gregory, the Law of Agency and Partnership § 25, at 65-66 (2d ed. 1990) (apparent agency where principal's conduct "leads a third party to believe that the agent has authority and thus creates *487 apparent authority to those persons who act upon it"). Rothschild placed its director (and employee) von Plotho in a position of responsibility within the organization and with respect to von Schönau's investments. As a result of his efforts, Rothschild obtained von Schönau as a client, opened multiple accounts, including a private equity account, obtained authorization to make nontraditional investments, and collected fees. See Restatement (Third) of Agency § 3.03 comment b, at 174 ("A principal may also make a manifestation by placing an agent in a defined position in an organization or by placing an agent in charge of a transaction or situation"). See also Fergus v. Ross, 477 Mass. 563, 567, 79 N.E.3d 421 (2017) ("Apparent authority exists when the principal, by his or her words or conduct, causes a third person to reasonably believe that the principal consents to the agent acting on the principal's behalf").
Von Schönau was entitled to an inference that, based on Rothschild's conduct in holding von Plotho out as an advisor, the written asset management documents provided to von Schönau, her visits with him to Massachusetts, and their discussions regarding CET and CCI, she reasonably believed that von Plotho was authorized by Rothschild to conduct activities related to her private equity investments. Viewed in the light most favorable to von Schönau, the fact that Rothschild held von Plotho out as an investment advisor, coupled with the failure of Rothschild to inform von Schönau that von Plotho was not authorized to advise her regarding private equity investments, left her in the dark regarding its internal policy, and would permit a fact finder to conclude that von Plotho was clothed with the apparent authority to act on the bank's behalf regarding investments generally. See Restatement (Third) of Agency § 3.03 comment b, at 174 ("Third parties who interact with the principal through the agent will naturally and reasonably assume that the agent has authority to do acts consistent with the agent's position or role unless they have notice of facts suggesting that this may not be so"); Ophthalmic Surgeons, Ltd. v. Paychex, Inc., 632 F.3d 31, 40 (1st Cir. 2011) (inaction or omissions by principal may be sufficient to create apparent authority in agent, even if agent is engaging in fraudulent activity). The Rothschild and von Plotho affidavits create a dispute of fact, but do not vitiate the prima facie showing. See Cepeda, 62 Mass. App. Ct. at 738, 819 N.E.2d 979.
Accordingly, whether on a theory of actual or apparent authority, or ratification, von Schönau made a prima facie showing *488 that von Plotho was Rothschild's agent with respect to his advice to her about private equity investments in Massachusetts. At a minimum, this prima facie showing is sufficient to demonstrate that von Plotho was Rothschild's agent from October 2003 through February 10, 2004, when von Schönau committed $ 10 million to CET to fund her January 2004 investment. The January 19, 2005 meeting at the bank in Zurich, memorialized in the bank's visit report, which stated that Rothschild would continue to monitor von Schönau's U.S. private equity investments, is further prima facie evidence that von Plotho acted with apparent authority and at the behest of Rothschild.
Rothschild claims, however, that the factual landscape changed so markedly beginning in June 2004 as to vitiate all claims of *112 agency. In that month, von Schönau transferred shares in CET that she valued at $ 1 million to ARA Overseas as a side payment to von Plotho for his private equity advice. Von Schönau signed two letters in 2005, one stating she would separately compensate von Plotho for the advice he was giving her, and the other stating, "It is fully clear to me that ... past and future private equity investments do not constitute investment recommendations made by Rothschild Bank AG."
Rothschild contends that the letters are dispositive admissions that von Schönau never thought von Plotho represented Rothschild in his private equity dealings with her, even at the inception of the investments. A fact finder may or may not agree, but resolution at this stage is premature. Von Schönau claims that she wrote the letters as an accommodation, and that she thought von Plotho was advising her on behalf of Rothschild. The visit by von Plotho and von Schönau to Boston and Fall River in March 2005 concerning CET occurred just two months after the January 19, 2005 meeting at Rothschild in which the bank promised to continue to monitor her U.S. private equity investments. The facts, and the inferences to be drawn from them, are disputed both as to the initial and subsequent investments.
Rothschild further points to the letter dated December 21, 2005, in which von Schönau informed Rothschild that she was moving her private equity investments to her own manager, ATAG. These facts may ultimately inform a fact finder's assessment of von Schönau's understanding of von Plotho's actual or apparent authority, and the bank's role in private equity investments, at various *489 points in time.[22] However, for present purposes, von Schönau has made a prima facie showing of personal jurisdiction based on either von Plotho's actual or apparent authority to act on behalf of Rothschild, or the bank's ratification of his activities throughout 2004 and into 2005. On the record before us, we cannot say as a matter of law that subsequent activities did not grow out of the initial relationship. And although von Plotho remained with Rothschild as a consultant in 2006 and thereafter, it is for the fact finder to determine whether he was an actual or apparent agent of the bank in that capacity.
b. Application of the long-arm statute to Rothschild. The Commonwealth's long-arm statute provides that a Massachusetts court may exercise jurisdiction over a person "who acts directly or by an agent ... as to a cause of action ... arising from the person's ... transacting any business in this Commonwealth." G. L. c. 223A, § 3 (a ). See New Hampshire Insur. Guar. Ass'n v. Markem Corp., 424 Mass. 344, 346, 676 N.E.2d 809 (1997) ("The reach of our courts is defined by G. L. c. 223A"). To satisfy § 3 (a ), "the facts must satisfy two requirements -- the defendant must have transacted business in Massachusetts, and the plaintiff's claim must have arisen from the transaction of business by the defendant." Tatro v. Manor Care, Inc., 416 Mass. 763, 767, 625 N.E.2d 549 (1994).
i. Transacting business. The phrase "transacting any business" in § 3 (a ) is "broadly construed." Cannonball Fund, 84 Mass. App. Ct. at 98, 993 N.E.2d 350, quoting Haddad v. Taylor, 32 Mass. App. Ct. 332, 335, 588 N.E.2d 1375 (1992). Section 3 (a ) "uses the word 'any' before the word 'business.' We interpret that term to be expansive, or to mean that the *113 volume of business need not be substantial but merely definite and perceptible." Diamond Group, 84 Mass. App. Ct. at 549, 998 N.E.2d 1018.
Von Plotho visited the Commonwealth multiple times on research missions designed to provide information about a possible investment for his client. He corresponded with CET, and procured millions in investment capital for the Massachusetts business. If von Plotho was Rothschild's agent, this constituted Rothschild's transacting business in the Commonwealth. See id.; Cannonball Fund, Ltd., 84 Mass. App. Ct. at 98-99, 993 N.E.2d 350.
ii. Arising from. "In establishing specific jurisdiction, particularly in the absence of a contractual or other continuing relationship with a Massachusetts plaintiff, our focus is directed to the *490 defendant's contacts at the time the cause of action arose, rather than when the complaint was filed." Fletcher Fixed Income Alpha Fund, Ltd. v. Grant Thornton LLP, 89 Mass. App. Ct. 718, 725, 54 N.E.3d 570 (2016). Accordingly, we begin by considering whether von Schönau's losses from her initial $ 10 million investment in CET (agreed to in January, and received by CET in February 2004) arise from von Plotho's contacts with Massachusetts starting in January and February 2004 -- when she claims to have relied on von Plotho's advice to make that investment.
Under the long-arm statute, whether a claim arises from the transaction of business in Massachusetts poses a "but for" test. Diamond Group, 84 Mass. App. Ct. at 550, 998 N.E.2d 1018. This means "a claim arises from a defendant's transaction of business in [Massachusetts] if the claim was made possible by, or lies in the wake of, the transaction of business in [this State]." Tatro, 416 Mass. at 771, 625 N.E.2d 549.
Although von Plotho's initial advice to von Schönau was apparently given in Switzerland, a direct line can be drawn from his Massachusetts contacts and that advice, such that "but for" von Plotho's actions in Massachusetts no investments would have been made.[23] See Tatro, supra. It follows that, if von Plotho was Rothschild's agent, von Schönau made out a prima facie case that her 2004 $ 10 million investment in CET arose from Rothschild's transaction of business in Massachusetts. See id.
It may be that factual findings regarding the February 2004 investment would be sufficient to confer personal jurisdiction over Rothschild without reference to subsequent activity. See Cannonball Fund, 84 Mass. App. Ct. at 98, 993 N.E.2d 350 ("anything but the most incidental commercial contact is sufficient" [quotation and citation omitted] ). Rothschild argues forcefully, however, that none of the business dealings with the Massachusetts companies can be attributed to it, particularly in light of those events occurring after December 2005, when von Schönau informed Rothschild that she would be moving her private equity investment accounts to ATAG. Again, this argument is premature. The claims here arise out of a long-term service relationship. There are facts from which differing inferences may be drawn. It will be *491 for a fact finder to determine whether none, some, or all of the *114 investments in CET and CCI were part of a "train of events" that properly can be attributed to von Plotho's earlier advice, if given as Rothschild's actual or apparent agent, or whether his continuing role as a consultant to Rothschild rendered him an actual or apparent agent even after the investment accounts were moved. Tatro, 416 Mass. at 770, 625 N.E.2d 549.
c. Constitutional considerations. We turn to constitutional due process considerations, if only to conclude that we cannot reach them. "Personal jurisdiction over an out-of-State defendant is proper only where both the forum State's long-arm statute and the requirements of due process allow it." SCVNGR, Inc. v. Punchh, Inc., 478 Mass. 324, 328, 85 N.E.3d 50 (2017). In Massachusetts, however, "[b]ecause the long-arm statute imposes specific constraints on the exercise of personal jurisdiction that are not coextensive with the parameters of due process, and in order to avoid unnecessary consideration of constitutional questions, a determination under the long-arm statute is to precede consideration of the constitutional question." Id. at 325, 85 N.E.3d 50. If the finder of fact does determine that personal jurisdiction under the long-arm statute exists, the constitutional question must be answered on the basis of the facts presented and found.
Accordingly, on remand, the fact finder must determine, after an evidentiary hearing or trial on the merits, whether statutory long-arm jurisdiction over Rothschild exists as to claims arising from von Schönau's investments in Massachusetts.[24] In the event von Schönau's case for long-arm jurisdiction survives application of the preponderance of the evidence standard, the judge will be able to conduct the required constitutional analysis with the benefit of "a presumably fuller record." SCVNGR, 478 Mass. at 330-331, 85 N.E.3d 50.
2. Rothschild's alternative arguments. Rothschild urges us to affirm on one of three alternative arguments, based on (i) forum selection clauses found in various documents governing von Schönau's accounts, (ii) forum non conveniens, see G. L. c. 223A, § 5, and (iii) principles of international comity. Having determined that *492 the court lacked jurisdiction over Rothschild, the motion judge did not address any of these issues. To varying degrees, they are all fact-intensive or involve discretionary decision-making.[25] Since the time this motion *115 was first heard, proceedings in Switzerland have gone forward and the balance of the Massachusetts case has gone to trial. Accordingly, these theories would be best addressed in the trial court in the first instance.
3. Summary judgment -- CET and Preston. In connection with her investment in CET, von Schönau asserted additional claims against both CET and Preston. As to those counts not waived on appeal,[26] the remaining ten counts present variations on the theme that CET and Preston were dishonest with von Schönau about CET's prospects for profitability, and but for that dishonesty, she would not have invested $ 14 million in the company.[27] These *493 claims were dismissed on summary judgment on the grounds that they were barred by the statute of limitations. "We review a decision to grant summary judgment de novo," drawing all inferences in the light most favorable to the nonmoving party. Boazova, 462 Mass. at 350, 968 N.E.2d 385.
The statutes of limitations applicable to the remaining CET-related claims are all three or four years. See G. L. c. 110A, § 410 (e ) ; c. 260, §§ 2A, 5A. Von Schönau's investments in CET occurred in January 2004 and May 2006; her last payment to CET was made in June 2008. Her original complaint was not filed until December 27, 2012, more than four years after her investments in CET. Accordingly, her claims against CET and her CET-related claims against Preston were untimely unless she can benefit from either the discovery rule or the tolling provision set forth in G. L. c. 260, § 12. Von Schönau bears the burden of proof on these issues. McGuinness v. Cotter, 412 Mass. 617, 620, 591 N.E.2d 659 (1992).
In accordance with the discovery rule, the statute of limitations begins to run on the date the plaintiff's injury "is, or reasonably should have been, discovered." Id. at 622, 591 N.E.2d 659. In a misrepresentation case, "the decision whether any misrepresentation should reasonably have been uncovered [is] made in light of what reasonable inquiry would have disclosed." Bowen v. Eli Lilly & Co., 408 Mass. 204, 206, 557 N.E.2d 739 (1990). "The plaintiff need not know the full extent of the injury before the statute starts to run." Id. at 207, 557 N.E.2d 739. "The important point is that the statute of limitations starts to run when an event or events have occurred that were reasonably *116 likely to put the plaintiff on notice that someone may have caused her injury." Id.
Here, the motion judge concluded that a reasonable person in von Schönau's circumstances would have suspected that CET's repeated assertions about its imminent commercial success were overblown by November 2008 at the latest -- more than four years before she commenced suit. Before she made her initial investment, von Schönau was told that CET was only one or two tests away from a "major breakthrough." In May 2004, she was told again that CET was close to profitability. During a meeting in February 2006, she was told that "various tests had been performed and that the breakthrough will come in a couple of months." Yet, as of a meeting in London in June 2006, von Schönau *494 was well aware that "[t]he breakthrough [had] not come." She confirmed this in her deposition testimony and also in responses to CET's statement of undisputed facts submitted in support of its summary judgment motion.
Von Schönau also confirmed that, as of the November 19, 2008 meeting in Zurich to which the motion judge referred, she was aware that CET had not yet produced any commercial products. In summary, even though CET's forecasts of a commercial breakthrough began before von Schönau's initial investment in 2004, she was well aware as of the spring of 2006 that the breakthrough had never occurred. Additionally, von Schönau does not dispute that documents plainly showing that CET was unprofitable, and, in fact, was suffering losses, were made available to her prior to December 2008. Based on this uncontroverted evidence, the judge correctly concluded that von Schönau was on inquiry notice as a matter of law as to the value of her investments in CET and the possibility that she had been misled well before December 27, 2008.
Von Schönau also argues for a different result on the theory that Preston or CET or both were her fiduciaries. General Laws c. 260, § 12, provides, "If a person liable to a personal action fraudulently conceals the cause of such action from the knowledge of the person entitled to bring it, the period prior to the discovery of his cause of action by the person so entitled shall be excluded in determining the time limited for the commencement of the action." Where G. L. c. 260, § 12, applies, "the statute of limitations begins to run when the plaintiff has actual knowledge of the wrong giving rise to his cause of action." Crocker v. Townsend Oil Co., 464 Mass. 1, 9, 979 N.E.2d 1077 (2012).
In the case of a fiduciary relationship, the actual knowledge standard applies even where the fiduciary has simply failed to disclose pertinent facts (as opposed to actively making misstatements). Passatempo v. McMenimen, 461 Mass. 279, 294-295, 960 N.E.2d 275 (2012). This is so because a fiduciary owes a duty of full disclosure to his or her principal, and thus, a failure to disclose "constitutes fraudulent conduct and is equivalent to fraudulent concealment for purposes of applying § 12." Id. at 294, 960 N.E.2d 275, quoting Demoulas v. Demoulas Super Mkts., Inc., 424 Mass. 501, 519, 677 N.E.2d 159 (1997).
"Accordingly, where a fiduciary relationship exists, G. L. c. 260, § 12, tolls the applicable statute of limitations until the plaintiff has actual knowledge of either the harm or the fiduciary's *495 implicit or explicit repudiation of his or her obligations." Passatempo, 461 Mass. at 295, 960 N.E.2d 275. In these circumstances, the event that causes the statute of limitations to run is "when the plaintiff first becomes aware of facts giving rise to her injury by the defendant, and not ... when [she] first understands the causal connection between her *117 injuries and a legally cognizable claim against the defendant." Doe v. Harbor Schs., Inc., 446 Mass. 245, 248, 843 N.E.2d 1058 (2006). Because the complaint was filed on December 27, 2012, von Schönau's fiduciary duty claims survive only if she first had actual knowledge of her cause of action after December 27, 2008.
We need not decide whether CET or Preston presented evidence to show they were fiduciaries, because Von Schönau's own admissions are sufficient to show not only that she was on inquiry notice of her losses, but also that she had actual knowledge before December 27, 2008, that she had been harmed. See Passatempo, 461 Mass. at 295, 960 N.E.2d 275.
Even though Preston and CET continued to make hopeful and enthusiastic statements about CET's prospects on dates within the four years before von Schönau sued them, she does not claim that they ever misled her about whether the company was profitable. CET was not profitable, and the undisputed facts show that von Schönau knew this at all relevant times. She (or those she employed) received annual Schedule K-1 and Schedule 3K-1 tax forms revealing losses for the years 2004, 2005, 2006, and 2008. In the statement of undisputed facts she admitted that she knew in May 2006 and November 2008 that CET had not developed any commercial products, and so testified at deposition. Moreover, nothing Preston or CET could have told von Schönau at any point could have altered von Schönau's own knowledge about when and why she committed funds to CET in the first place. At all times beginning in December 2003, von Schönau knew that (i) CET had made certain representations to her, and (ii) she had relied on those representations in committing millions of dollars to CET. And, by at least November 2008, she knew that (i) the representations turned out to be incorrect or untrue, and (ii) the investments she made were, thus, not of the quality she had been led to believe. See Zimmerman v. Kent, 31 Mass. App. Ct. 72, 77, 575 N.E.2d 70 (1991) (describing elements of misrepresentation). Whether she perceived at the time that she might have legal recourse is immaterial. See Doe, 446 Mass. at 248, 843 N.E.2d 1058. Accordingly, von Schönau had actual knowledge of her injury because she knew about *496 CET's losses and the repeated failure of CET's plans for commercialization by November 2008. See Stetson v. French, 321 Mass. 195, 198, 72 N.E.2d 410 (1947) ("a cause of action is not concealed from one who has knowledge of the facts that create it"). See also Cohen v. State St. Bank & Trust Co., 72 Mass. App. Ct. 627, 631-632, 893 N.E.2d 425 (2008) (investor who received monthly statements and other communications had actual knowledge that he was harmed by advisor's investment strategy). Because von Schönau did not file suit for more than four more years after she learned of her injury, her CET-related claims were untimely. Summary judgment was properly granted.
4. Summary judgment -- CCI and Preston. The remaining counts against CCI and Preston rest on the foundational theory that CCI misled von Schönau, duping her into an investment she would not have made had she known the full truth about the company.[28] In their summary *118 judgment motions, CCI and Preston argued that judgment should enter in their favor because there was no evidence in the record that CCI (through Preston and Read) provided any false information to von Schönau. Because the pleadings left the motion judge "in doubt" as to the specific misstatements on which von Schönau was relying, he required her to identify them in advance of his ruling. See Mass. R. Civ. P. (9) (b), 365 Mass. 751 (1974).
In response, von Schönau pointed to the following statements: (1) Read told her at a meeting in March 2008 that he had reason to believe he could raise a $ 1 billion fund, that he had turned down multiple job offers in order to work with CCI (when, in fact, he had only turned down one), and that he had the experience to manage a fund like CCI; (2) Read projected in a "mini business plan" that von Schönau would receive a return of eight times her *497 investment; and (3) Preston stated in an April 2008 letter that "[t]he value of our ownership in [CCI] could exceed the entire value of [CET] at last investment within a short period if we succeed with the fund raising effort."
"To sustain a claim of misrepresentation, a plaintiff must show a false statement of a material fact made to induce the plaintiff to act, together with reliance on the false statement by the plaintiff to the plaintiff's detriment." Zimmerman, 31 Mass. App. Ct. at 77, 575 N.E.2d 70. "A statement on which liability for misrepresentation may be based must be one of fact, not of expectation, estimate, opinion, or judgment." Id. at 79, 575 N.E.2d 70. "Moreover, 'false statements of opinion, of conditions to exist in the future,' and promises to perform an act cannot sustain a claim for negligent misrepresentation ... unless the promisor had no intention to perform the promise at the time it was made." Cumis Ins. Soc'y, Inc. v. BJ's Wholesale Club, Inc., 455 Mass. 458, 474, 918 N.E.2d 36 (2009), quoting Yerid v. Mason, 341 Mass. 527, 530, 170 N.E.2d 718 (1960).
In a thoughtful and exhaustive decision, the motion judge concluded that none of the statements von Schönau relied upon were actionable. Read's statements about his qualifications and abilities were truthful at best and mere puffery at worst. His projection of an eightfold return on investments was a mathematical calculation based on earning a management fee of two percent on a $ 1 billion fund and earning an incentive fee of twenty percent on returns from the fund's investments.[29] Finally, the judge concluded, Preston's statement in his April 2008 letter was puffery and not fraud -- and probably would have been accurate had CCI raised a billion dollar fund anyway. "Most, if not all, courts hold that there are certain types of statements upon which a purchaser is not *119 justified in placing reliance. Thus a statement that an article is made of the finest material obtainable, that a particular automobile is the most economical car on the market, or that a certain investment is sound and will yield a handsome profit, and similar claims are generally understood to be matters of *498 opinion and if reliance is placed on them and they turn out otherwise the law does not afford a remedy." Kabatchnick v. Hanover-Elm Bldg. Corp., 328 Mass. 341, 344, 103 N.E.2d 692 (1952). "[T]his 'rule of law is hardly to be regretted, when it is considered how easily and insensibly words of hope or expectation are converted by an interested memory into statements of quality and value when the expectation has been disappointed.' " Id., quoting Deming v. Darling, 148 Mass. 504, 506, 20 N.E. 107 (1889).
Having reviewed the massive record de novo, we agree with the motion judge's legal conclusion that none of the statements von Schönau points to are actionable as common law fraud, violations of Massachusetts securities law, violations of G. L. c. 93A, or otherwise. Thus, summary judgment for CCI and Preston on von Schönau's CCI-related claims was proper.
5. Claims against Porter. Before addressing CET's statute of limitations argument, the judge who authored the summary judgment decision determined that Porter was entitled to judgment on substantive grounds because the allegations against him simply did not amount to any actionable conduct. Construing von Schönau's claims against Porter as arising solely from his consenting, as a CET manager, to the offer of share options to von Plotho and others, the judge found that this single act could not form the basis of a claim against Porter on any theory.
In her appellate brief, von Schönau makes no argument about the judge's substantive reasons for entering judgment for Porter -- she simply treats his statute of limitations ruling as applying to Porter as well as to CET and Preston. Accordingly, as Porter points out, von Schönau waived her appeal from the judgment entered in his favor. See Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 921 (1975). In any event, we see no reason why CET and Preston's successful statute of limitations defense does not also apply to Porter. And, to the extent von Schönau sought recovery from Porter on any theory arising from his connection to CCI (presumably as an advisor to that entity), CCI and Preston's entitlement to summary judgment also applies equally to Porter. See Clair v. Clair, 464 Mass. 205, 214, 982 N.E.2d 32 (2013) ("An appellate court may affirm a correct result based on reasons that are different from those articulated by the judge below").
Conclusion. So much of the judgment as dismisses the claims against Rothschild on the basis of lack of personal jurisdiction is *499 vacated, and the matter is remanded for further proceedings consistent with this opinion. In all other respects, the judgment is affirmed.
So ordered.

CET described its business as "researching, developing, and attempting to commercialize experimental technologies based on electromagnetic chemistry and modification of the electronic structure of elements." CCI's goal was to raise funds to be invested in "transformative energy and materials technologies."

On December 20, 2012, Rothschild brought suit against von Schönau in Switzerland, seeking a declaration that the bank had no liability with respect to the private equity transactions now at issue in this case. Von Schönau brought the instant suit in Superior Court one week later, on December 27, 2012.

Separate and final judgment against von Plotho entered in December 2014 in the amount of $ 14,946,979, with $ 1 million of that amount enforceable jointly and severally against ARA Management. Neither von Plotho nor ARA Management appealed from that judgment.

The motion judges issued thoughtful and comprehensive decisions -- an eighty-three page decision on Rothschild's motion to dismiss, and a fifty-three page decision on the motions for summary judgment. The vast majority of the rulings have not been challenged on appeal.

All of the original Rothschild documents are written in German. English translations are included in the record.

AOM was born of an earlier company run by Preston and Nagel called Molten Metal Technology, Inc. (MMT). MMT had gone public but then failed, filed for bankruptcy, and was sued for securities fraud. Through various intermediate corporate entities, Preston and Nagel acquired intellectual property owned by MMT and licensed it to AOM. For simplicity, we refer to both AOM and CET as CET.

Von Plotho did not sign the CET share option agreement until 2008, and, as of April, 2016, he had never exercised the option or joined CET's advisory board.

Von Schönau "often discussed [with von Plotho] the merits of the Massachusetts investments that had necessitated the particular trip.... As a result, there was at least as much discussion between us in Massachusetts concerning the investments ... as there was in Switzerland."

Later, ARA Overseas was reorganized and became ARA Management, a Panamanian entity. (See note 5, supra.)

Von Plotho's Rothschild agreement provided that he would "promote the interests of the Bank in relation to the provision of financial services to persons in different countries ...," including coaching of existing clients. For those services, he would earn a fee of 300,000 Swiss francs per year plus a finder's fee for new assets acquired. The agreement also stated that von Plotho was "free to offer his advisory services to third parties" so long as he refrained from participating in any business in competition with Rothschild.

"Their side" refers to the bank's client and any of her other advisors in attendance at the meeting. Rothschild notes that although the formal bank records of most of these meetings included a box that could be checked to indicate a "[Rothschild] Agreement on Investment Advice," that box is not checked on any form on which it appears in connection with the 12000 account or the 20200 account.

Von Schönau averred that Rothschild provided her with investment statements that "showed her investments on an at-cost basis, without showing their performance or fair market value." On appeal, however, Von Schönau has not supplied citation to where these documents may be found in the massive record, and our own search has not revealed them.

In August 2008, ATAG created Tripex Investments, a Cayman Island corporation, and von Schönau thereafter transferred various of her U.S. assets to Tripex. In 2011, Tripex was reorganized, and Ebur Investments, LLC became the surviving entity. Von Schönau's Swiss advisors at Aretas AG, a spin-off of ATAG, were preparing the transfer of her U.S. holdings to the new entity and required a valuation.

As of August 31, 2011, von Plotho's consulting agreement with Rothschild was also terminated.

Von Schönau claimed that, with their extravagant spending, Preston and Read wasted the funds she invested in CCI. Read's initial salary at CCI was $ 1 million. The firm spent $ 5.7 million on its build-out of office space in Cambridge, which was never completed.

A business is resident in Massachusetts if it is domiciled or incorporated here or has its principal place of business in the Commonwealth. Exxon Mobil Corp. v. Attorney Gen., 479 Mass. 312, 314, 94 N.E.3d 786 (2018). Rothschild meets none of these criteria.

In July 2013, faced with Rothschild's motion to dismiss, von Schönau brought a motion for limited jurisdictional discovery. It appears that the motion judge did not separately rule on this motion, but effectively denied it in dismissing Rothschild from the case. In her motion for relief from the order of dismissal, von Schönau reasserted her request for jurisdictional discovery. The motion was denied without discussion of the discovery issue. There is no dispute that the evidence was discovered after the motion to dismiss had been allowed, and that von Schönau pursued discovery diligently. See Cahaly v. Benistar Prop. Exch. Trust Co., 451 Mass. 343, 361, 885 N.E.2d 800, cert. denied, 555 U.S. 1047, 129 S.Ct. 637, 172 L.Ed.2d 612 (2008). The evidence was of "such a nature" that it would impact the result. Id. The motion judge considered the evidence, as do we.

That is, we examine whether "the judge made 'a clear error of judgment in weighing' the factors relevant to the decision, ... such that the decision falls outside the range of reasonable alternatives." L.L. v. Commonwealth, 470 Mass. 169, 185 n.27, 20 N.E.3d 930 (2014).

Any such side deal would have required the approval of Rothschild -- the employment agreement required it. Moreover, the employment agreement prohibited the receipt of gifts or benefits for services rendered. No evidence of Rothschild's approval appears in the record.

These factual findings will be relevant to personal jurisdiction, and to liability and damages for various transactions over time.

In October 2003, prior to von Schönau's initial investment in CET, von Plotho traveled to Massachusetts to gather information about the potential investment. He agreed to solicit an investment from von Schönau. He thereafter corresponded with Preston, sending a facsimile to a number in the 508 area code, in which he confirmed that von Schönau wanted to purchase shares in CET.

Because we are remanding this case for an evidentiary hearing or trial on the issue of personal jurisdiction, von Schönau should be permitted to renew her request for discovery in light of these changed circumstances. Whether further discovery should be had is for the judge to decide. See Solimene v. B. Grauel & Co., K.G., 399 Mass. 790, 799, 507 N.E.2d 662 (1987) ("The conduct and scope of discovery is within the sound discretion of the judge").

While construction and enforceability of a forum selection clause is not always fact-intensive, see Boland v. George S. May Int'l Co., 81 Mass. App. Ct. 817, 823, 969 N.E.2d 166 (2012), here von Schönau argues that these contractual provisions should be disregarded because a fiduciary relationship existed between the parties. Additionally, the parties have submitted lengthy reports from Swiss legal experts who disagree about the meaning or enforceability of the clauses under Swiss law. The forum non conveniens theory involves a decision "left to the discretion of the trial judge," Gianocostas v. Interface Group-Mass., Inc., 450 Mass. 715, 723, 881 N.E.2d 134 (2008), which requires consideration of factors fitting into two categories: "matters of public concern and the private interests of the litigants." Minnis v. Peebles, 24 Mass. App. Ct. 467, 469, 510 N.E.2d 289 (1987). Rothschild also refers to an abstention doctrine whereby a court of one sovereign declines to act when another sovereign also has a legitimate claim of jurisdiction. See Goldhammer v. Dunkin' Donuts, Inc., 59 F. Supp. 2d 248, 252 (D. Mass. 1999). Its application involves a detailed multi-factored analysis. See id. at 252-253. All of these issues are wholly unsuited to resolution for the first time in an appellate proceeding.

Von Schönau makes no argument on appeal regarding count III, unjust enrichment. Thus, her appeal from the dismissal of count III against CET is waived. To the extent von Schönau's count XXI for waste was alleged on behalf of CET against Preston, it was ordered dismissed without prejudice at the summary judgment stage because it was based on events occurring long after the litigation had been commenced and because the judge found it improper for von Schönau to assert a claim derivatively on behalf of CET in the same action in which she was suing CET. The final judgment, however, dismissed all claims against Preston (including the waste claim) on the merits. Von Schönau makes no argument about the waste claim and, thus, she has waived her appeal as to count XXI insofar as it is alleged on behalf of CET. See Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 921 (1975).

The motion judge described von Schönau's claims as arising from Preston's January 15, 2004 letter to von Plotho, which "attempt[ed] to quantify the returns from the first product to a 2 [percent] investor in [CET]" and projected a sales target of $ 3 billion after one year (and increasing from there). In that letter, Preston valued a two percent interest in CET at $ 60 million after one year, $ 120 million after two years, and $ 180 million after three years.

Von Schönau makes no argument regarding resolution of counts III, VIII, IX, XVII, and XXI, and thus has waived her appeal concerning them. See Mass. R. A. P. 16 (a) (4). At the time Rothschild was dismissed from the case, the same motion judge ordered count III dismissed insofar as it was alleged against CCI and also ordered count VIII dismissed in its entirety. The judge who ruled on the summary judgment motions determined that von Schönau's assertion of corporate waste on behalf of CCI in count XXI, based on Read's salary and the expenses associated with the build-out of CCI's Cambridge office space, was untimely (tacitly ordering judgment for CCI on that basis). Von Schönau has not challenged any of these rulings. As to counts IX and XVII, it is unclear why von Schönau appears to have dropped these claims from her appeal insofar as they concern CCI, but, in any event, judgment properly entered in favor of CCI and Preston on these counts for the same reasons discussed infra.

CCI and Preston point out that the section of the business plan relied upon by von Schönau is replete with words such as "projected" and "target." We note additionally that the text of the plan speaks to what CCI "should earn" and "what we believe will conservatively be realized." See Stolzoff v. Waste Sys. Int'l, Inc., 58 Mass. App. Ct. 747, 763, 792 N.E.2d 1031 (2003) ("statements concerning the future value of the company's stock, plainly concerning future events and being inherently speculative in nature, are not actionable as matter of law").